UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.                                              24 Cr. 427 (LGS)

SUE MI TERRY,

*Defendant*.

---

**MEMORANDUM OF LAW IN SUPPORT OF DR. SUE MI TERRY'S PRETRIAL
MOTIONS**

KRIEGER LEWIN LLP
350 Fifth Avenue, 77th Floor
New York, NY  10118
Telephone: (212) 390-9550

SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY  10104
Telephone: (212) 390-9000

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019-6099
Telephone: (212) 728-8000

JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY  10036-2711
Telephone: (212) 891-1600

*Attorneys for Dr. Sue Mi Terry*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ......................................................................................................... 2

    I.       DR. TERRY'S BACKGROUND.................................................................. 2

    II.      THE INDICTMENT ................................................................................ 3

ARGUMENT............................................................................................................. 11

    I.       MOTION TO DISMISS THE INDICTMENT .......................................... 11

        A.   Legal Standard ..................................................................................... 11

        B.   The Indictment Pursues a Novel Criminal Prosecution That Is Contrary to FARA's Longstanding Purpose—Disclosure of Malign Foreign Influence............................... 12

        C.   Count Two Is Defective Because It Fails to State a Willful Violation of FARA......... 15

        D.   Criminal Penalties for Violating FARA Are Facially Void for Vagueness................. 25

        E.   FARA's Definitions of "Political Activities" and "Political Consult[ing]" Are Void for Vagueness as Applied to the Allegations in the Indictment......................................... 30

        F.   Count Two Is Defective Because It Is Duplicitous......................................... 32

        G.   Count One (Conspiracy) Fails for the Same Defects................................... 33

    II.      MOTION FOR A BILL OF PARTICULARS ......................................... 34

        A.   Legal Standard ..................................................................................... 35

        B.   Dr. Terry Is Entitled to a Bill of Particulars................................................. 36

    III.     MOTION TO SUPPRESS DR. TERRY'S COERCED STATEMENTS.................. 39

        A.   The FBI's Custodial Interrogation of Dr. Terry........................................... 40

        B.   *Miranda* Legal Standard ........................................................................ 42

        C.   Dr. Terry's Alleged Statements During the June 2023 Custodial Interrogation Must Be Suppressed ............................................................................................. 43

    IV.     MOTION TO SUPPRESS AND FOR DISCLOSURE OF FISA MATERIALS........ 45

        A.   FISA Legal Standard................................................................................ 46

B.   The Court Should Closely Scrutinize the FISA Applications and Materials and Suppress Any Evidence Obtained or Derived Unlawfully............................................ 48

C.   The Court Should Disclose FISA Materials to the Defense, to the Extent the Court Deems Appropriate........................................................................................................ 50

**CONCLUSION** ........................................................................................................................ **50**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Att'y Gen. of United States v. Irish N. Aid Comm.*,
  668 F.2d 159 (2d Cir. 1982).......................................................... *passim*

*Att'y Gen. of United States v. Wynn*,
  104 F.4th 348 (D.C. Cir. 2024)......................................................14, 32

*Berkemer v. McCarty*,
  468 U.S. 420 (1984).......................................................................42, 43

*Brady v. Maryland*,
  373 U.S. 83 (1963).........................................................................48, 50

*Bryan v. United States*,
  524 U.S. 184 (1998)..............................................................................22

*Cheek v. United States*,
  498 U.S. 192 (1991).................................................................... *passim*

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965)..............................................................................26

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)..............................................................................26

*Guan v. Mayorkas*,
  530 F. Supp. 3d 237 (E.D.N.Y. 2021) ................................................20

*Hughey v. United States*,
  495 U.S. 411 (1990)..............................................................................24

*Miranda v. Arizona*,
  384 U.S. 436 (1966)............................................................39, 42, 44, 45

*Ocasio v. United States*,
  578 U.S. 282 (2016)........................................................................33, 34

*Ratzlaf v. United States*,
  510 U.S. 135 (1994)..............................................................................24

*Rehaif v. United States*,
  588 U.S. 225 (2019)..............................................................................22

*Salinas v. United States*,
  522 U.S. 52 (1997) ..................................................................................33, 34

*The New York Times Co. v. Gonzales*,
  459 F.3d 160 (2d Cir. 2006) ..............................................................20

*United States v. Abu Jihaad*,
  630 F.3d 102 (2d Cir. 2010) ..........................................................46, 50

*United States v. Adames*,
  878 F.2d 1374 (11th Cir. 1989) .......................................................23, 24

*United States v. Aleynikov*,
  676 F.3d 71 (2d Cir. 2012) ...................................................................12

*United States v. Aracri*,
  968 F.2d 1512 (2d Cir. 1992) .............................................................34

*United States v. Bankman-Fried*,
  680 F. Supp. 3d 289 (S.D.N.Y. 2023) ...............................................17

*United States v. Barnes*,
  158 F.3d 662 (2d Cir. 1998) ...........................................................35, 39

*United States v. Bass*,
  404 U.S. 336 (1971) ...........................................................................24

*United States v. Berger*,
  224 F.3d 107 (2d Cir. 2000) ...............................................................34

*United States v. Bin Laden*,
  92 F. Supp. 2d 225 (S.D.N.Y. 2000) ..............................................37, 39

*United States v. Bishop*,
  412 U.S. 346 (1973) ...........................................................................21

*United States v. Bortnovsky*,
  820 F.2d 572 (2d Cir. 1987) ...............................................................35

*United States v. Burden*,
  934 F.3d 675 (D.C. Cir. 2019) ...........................................................22

*United States v. Butt*,
  No. 18 Cr. 87 (NSR), 2019 WL 479117 (S.D.N.Y. Feb. 7, 2019) .............43, 44, 45

*United States v. Carroll*,
  102 F. Supp. 3d 1134 (N.D. Cal. 2015) ..............................................44

*United States v. Carter*,
    489 F.3d 528 (2d Cir. 2007)..................................................................42

*United States v. Concord Mgmt. & Consulting LLC*,
    385 F. Supp. 3d 69 (D.D.C. 2019) ..............................................36, 37, 38

*United States v. Craighead*,
    539 F.3d 1073 (9th Cir. 2008) ..............................................................43

*United States v. Daoud*,
    755 F.3d 479 (7th Cir. 2014) ................................................................49

*United States v. Davidoff*,
    845 F.2d 1151 (2d Cir. 1988)..................................................35, 36, 37

*United States v. Duggan*,
    743 F.2d 59 (2d Cir. 1984)..................................................................48, 50

*United States v. Eppolito*,
    543 F.3d 25 (2d Cir. 2008)....................................................................34

*United States v. Familetti*,
    878 F.3d 53 (2d Cir. 2017)....................................................................44

*United States v. Faux*,
    828 F.3d 130 (2d Cir. 2016)..................................................................45

*United States v. FNU LNU*,
    653 F.3d 144 (2d Cir. 2011)..................................................................43

*United States v. Geibel*,
    369 F.3d 682 (2d Cir. 2004)..................................................................34

*United States v. Hansen*,
    599 U.S. 762 (2023)........................................................................20, 29

*United States v. Heicklen*,
    858 F. Supp. 2d 256 (S.D.N.Y. 2012)..................................................4, 12

*United States v. LaSpina*,
    299 F.3d 165 (2d Cir. 2002)..................................................................37

*United States v. Mancuso*,
    420 F.2d 556 (2d Cir. 1970)..................................................................25

*United States v. Mattice*,
    186 F.3d 219 (2d Cir. 1999)..................................................................24

*United States v. McGoff*,
   831 F.2d 1071 (D.C. Cir. 1987) ........................................................................... 25

*United States v. Mittel-Carey*,
   493 F.3d 36 (1st Cir. 2007) .................................................................................. 44

*United States v. Murray*,
   618 F.2d 892 (2d Cir. 1980) ................................................................................. 12

*United States v. Newton*,
   369 F.3d 659 (2d Cir. 2004) ...................................................................... 42, 43, 44

*United States v. Nordean*,
   579 F. Supp. 3d 28 (D.D.C. 2021) ....................................................................... 12

*United States v. Pinto-Thomaz*,
   352 F. Supp. 3d 287 (S.D.N.Y. 2018) .................................................................. 35

*United States v. Rosen*,
   447 F. Supp. 2d 538 (E.D. Va. 2006) ................................................................... 47

*United States v. Sattar*,
   272 F. Supp. 2d 348 (S.D.N.Y. 2003) .............................................................. 30, 31

*United States v. Silver*,
   948 F.3d 538 (2d Cir. 2020) ............................................................................ 18, 20

*United States v. Sterritt*,
   No. 21 Cr. 193 (KAM), 2023 WL 7386660 (E.D.N.Y. Nov. 8, 2023) .................... 5

*United States v. Sun*,
   No. 24 Cr. 346 (E.D.N.Y. filed Dec. 4, 2024) ..................................................... 15

*United States v. Svoboda*,
   347 F.3d 471 (2d Cir. 2003) ................................................................................. 33

*United States v. Tartaglione*,
   No. 16 Cr. 832 (KMK), 2023 WL 2237903 (S.D.N.Y. Feb. 27, 2023) ............. 44, 45

*United States v. Torres*,
   901 F.2d 205 (2d Cir. 1990) ................................................................................. 35

*United States v. Wang*,
   No. 23 Cr. 118-3 (AT), 2024 WL 1251105 (S.D.N.Y. Mar. 22, 2024) ................. 35

*United States v. Watson*,
   404 F.3d 163 (2d Cir. 2005) ................................................................................. 45

*United States v. Williams*,
   205 F.3d 23 (2d Cir. 2000).................................................................34

*United States v. X-Citement Video, Inc.*,
   513 U.S. 64 (1994)..........................................................................22

*Viereck v. United States*,
   318 U.S. 236 (1943)........................................................................25

*Winters v. New York*,
   333 U.S. 507 (1948)..................................................................12, 26

*Young v. Am. Mini Theatres, Inc.*,
   427 U.S. 50 (1976)..........................................................................26

## Constitutional Provisions

U.S. CONST. amend. I............................................................... *passim*

U.S. CONST. amend. V...........................................................26, 42

## Statutes, Regulations, and Proposed Regulations

28 C.F.R. § 5.1......................................................................................26

28 C.F.R. § 5.2......................................................................................26

28 C.F.R. § 5.100..................................................................................18

28 C.F.R. § 5.304..................................................................................27

18 U.S.C. § 228.....................................................................................24

18 U.S.C. § 793.....................................................................................46

18 U.S.C. § 794.....................................................................................46

18 U.S.C. § 2339B................................................................................30

18 U.S.C. § 3282...................................................................................14

22 U.S.C. § 611.......................................................................... *passim*

22 U.S.C. § 612............................................................................13, 23

22 U.S.C. § 613.......................................................................... *passim*

22 U.S.C. § 618..................................................................14, 21, 28

22 U.S.C. § 2278 ..........................................................................................23

50 U.S.C. § 1801 .......................................................................................2, 47

50 U.S.C. § 1802 ..........................................................................................46

50 U.S.C. § 1803 ..........................................................................................46

50 U.S.C. § 1804 .....................................................................................46, 48

50 U.S.C. § 1805 .................................................................................46, 47, 49

50 U.S.C. § 1806 .................................................................................45, 47, 50

50 U.S.C. § 1821 ............................................................................................2

50 U.S.C. § 1823 ..........................................................................................46

50 U.S.C. § 1824 ..........................................................................................46

50 U.S.C. § 1825 .................................................................................45, 47, 50

Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed.
    Reg. 40 (proposed Jan. 2, 2025) ..............................................................23

**Rules**

Fed. R. Crim. P. 7 ....................................................................................12, 35

Fed. R. Crim. P. 12 .................................................................................11, 12

Fed. R. Crim. P. 29 ......................................................................................32

Local Crim. Rule 16.1 ..................................................................................35

**Legislative Materials**

79 Cong. Rec. 2668 (1935) ...........................................................................13

83 Cong. Rec. 8021 (1938) ...........................................................................13

**Government Policies and Guidance**

*Audit of the Nat'l Sec. Div.'s Enf't & Admin. of the Foreign Agents Registration
    Act* (Sept. 7, 2016), https://oig.justice.gov/reports/audit-national-security-
    divisions-enforcement-and-administration-foreign-agents ......................................25

Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Nat'l Sec. Div.'s Enf't & Admin. of the Foreign Agents Registration Act* (Sept. 7, 2016) https://oig.justice.gov/reports/audit-national-security-divisions-enforcement-and-administration-foreign-agents .............................................................................15

U.S. Dep't of Just., *Recent Cases: FARA Cases* (Oct. 25, 2024), https://www.justice.gov/nsd-fara/recent-cases .........................................................15

U.S. Dep't of Just., *U.S. Attorneys' Manual: Criminal Resource Manual* § 2062, https://www.justice.//usam/criminal-resource-manual-2062-foreign-agents-registration-act-enforcement ...........................................................................10

**Other Sources**

Chung-in Moon, "In defense of Sue Mi Terry," *Hankyoreh* (Aug. 27, 2024), https://www.hani.co.kr/arti/english_edition/english_editorials/1155517.html ........................2

David S. Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* (2024) ...............................................................................47, 48

InterAction, *An Open Letter to the Congress concerning Foreign Agent Registration Act* (April 23, 2018), https://www.interaction.org/wp-content/uploads/2018/05/interaction_-_open_letter_to_congress_on_foreign_agent_registration_act_-_4.23.2018_1.pdf ............................................28

Katie Benner, "Justice Dept. to Step Up Enforcement of Foreign Influence Laws," *N.Y. Times* (Mar. 6, 2019), https://www.nytimes.com/2019/03/06/us/politics/fara-task-force-justice-department.html ...............................................................................15

Letter from Ron Wyden & Jamie Raskin to Merrick Garland (Oct. 24, 2024), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/Letter%20to%20DOJ%20on%20Kushner%20-%20FARA%20%28Wyden%20-%20Raskin%29%20final.pdf ...........................................29

Michael Castrovilla, "The Inherently Political Nature of the Foreign Agents Registration Act: A Statute in Need of Improvement," 10 *Nat'l Sec. L.J.* 176 (2023) ...............................................................................29

Monica Romero, Comment, "How Far Will FARA Go? The Foreign Agents Registration Act and the Criminalization of Global Human Rights Advocacy," 96 *Wash. L. Rev.* 695 (2021) ...............................................................................29

Nick Robinson, "'Foreign Agents' in an Interconnected World: FARA and the Weaponization of Transparency," 69 *Duke L.J.* 1075 (2020) ...........................29

## PRELIMINARY STATEMENT

Dr. Sue Mi Terry is many things: a widely respected foreign policy expert, a prolific writer, a fiercely independent thinker, a go-to breaking news analyst, and, central to all this, a proud American who has faithfully served her country.  But there is one thing she assuredly is not and has never been: an agent of the government of South Korea ("South Korea," "Republic of Korea," or "ROK").  While the Indictment spills an extraordinary amount of ink in its attempt to hold Dr. Terry criminally liable for violating the Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq.*, it fails.  Instead, the Indictment tells the story (while omitting and distorting key details) of a former government employee who made the leap to the world of think tanks and journalism.  It tells of a prominent foreign affairs expert becoming precisely what she in fact is: one of the nation's leading *independent* experts on the Korean Peninsula.

The Indictment is also instructive in what it does *not* say.  It does not specify which activities rendered Dr. Terry a foreign agent, thereby triggering her obligation to register under FARA.  FARA specifically enumerates activities that require FARA registration, but the Indictment spews factual allegations that, on their face, indisputably do not fit into any of those statutorily enumerated activities.  Nor does the Indictment allege that Dr. Terry was aware of any registration obligation she may have had, or that she was ever advised that she had an obligation to register, notwithstanding the vigor with which the Indictment details how the government tracked her every move for years and her numerous interactions with federal agents.  In other words, even if there were facial allegations of FARA-registrable activity, the Indictment fails to allege that any failure to register was willful.  These omissions of FARA's essential elements are fatal to the government's case.  The Indictment also does not claim that Dr. Terry took any position that was contrary to or inconsistent with U.S. interests, and, critically, intentionally omits the fact that for many years relevant to the Indictment, Dr. Terry was one of the most

prominent public *critics* of the then-South Korean government's foreign policy.[1]

The prosecution of Dr. Terry is as dangerous as it is legally unmoored. In this regard, the impact of the government's decision to charge Dr. Terry cannot be overstated. Wielding the blunt instrument of FARA, in a first-of-its kind prosecution involving one of America's closest democratic allies, the government has sidelined a staunch advocate for U.S. interests in Asia during a time of significant upheaval. More broadly, this case threatens the ways in which all academics, think tankers, and journalists do their work—work that is essential to a healthy democracy. All told, this case raises significant constitutional concerns, both in the charges themselves and in the manner in which the case was investigated. For these reasons, explained further below, the case against Dr. Terry should be dismissed. In the alternative, Dr. Terry respectfully moves for an order: (i) directing the government to produce a bill of particulars, (ii) suppressing Dr. Terry's coerced statements, and (iii) suppressing information and materials that were unlawfully obtained pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), as amended, 50 U.S.C. §§ 1801–1812 and 1821–1829.

## BACKGROUND

### I.     DR. TERRY'S BACKGROUND

Up until the date of her arrest, Dr. Terry was the prototypical American immigrant success story. Having arrived in the United States when she was 12 years old in the wake of her father's untimely death, Dr. Terry overcame early tragedy to earn a Ph.D. in International Relations from one of the most prestigious and rigorous institutions in the country. From there,

---

[1] As a former senior South Korean official has observed, the idea that she was an agent for the South Korean government, while frequently and vehemently speaking out against it, is logically absurd. *See* Chung-in Moon, "In defense of Sue Mi Terry," *Hankyoreh* (Aug. 27, 2024), https://www.hani.co.kr/arti/english_edition/english _editorials/1155517.html (last visited Feb. 25, 2025) ("At least for the Moon [Jae-in] administration [from 2017 to 2022], Terry was a Korean Peninsula expert who was extremely hard to handle.").

she dedicated a decade to public service, working in the Central Intelligence Agency ("CIA"), the National Security Council ("NSC"), and the National Intelligence Council ("NIC") from 2001 to 2010, earning commendations for her contributions to U.S. security. She then spent a year, 2010 to 2011, as a visiting intelligence fellow at a leading New York think tank.

After a decade of public service, Dr. Terry elected to leave the government and to stay in New York for family reasons. She found a job as a senior research scholar at a distinguished university in New York. Dr. Terry remained at the university until 2017, when she took a position at a Washington D.C. think tank. From there, Dr. Terry ascended in the think tank world—one still largely dominated by men. By 2022, she was appointed director of the Asia Program of one of the world's leading think tanks, also located in Washington. As a regional expert, she was expected to be eminently knowledgeable about geopolitical factors impacting Asia, and the Korean Peninsula specifically. She also had to remain visible—by writing, hosting events, and appearing on media programs to discuss breaking news. She was, among other things, a paid analyst for a cable news network, a co-host of a biweekly YouTube show on Korean politics, and the producer of an award-winning documentary. Having strong relationships with South Korean officials was critical to her work collecting, critiquing, and synthesizing information to produce insightful analysis that went beyond the news headlines. The government misses this entirely. Using a wide array of government surveillance mechanisms, including intelligence authorities, the government radically misinterprets and mischaracterizes standard fare activities for a foreign policy expert like Dr. Terry to criminalize her work and charge her with failing to register under FARA.

## II.    THE INDICTMENT

On July 16, 2024, Dr. Terry was arrested and charged in a two-count indictment, alleging a violation of FARA and a conspiracy to violate FARA. *See* Indictment ("Ind."), ECF No. 2. As

alleged in the Indictment,[2] Dr. Terry is a naturalized U.S. citizen who was born in South Korea.[3]
*Id.* ¶ 5.  She is not alleged to have ever served as an intelligence officer of the South Korean
government or to have provided any sensitive, much less classified, information to it.
Importantly, throughout the relevant period in the Indictment, Dr. Terry had no role in the U.S.
government whatsoever and no access to any classified information.[4]  She was a private citizen.
After leaving the government, Dr. Terry worked at academic institutions and think tanks in
Washington, D.C. and New York City.  *Id.*  In connection with her professional responsibilities,
Dr. Terry has made many media appearances, published articles, hosted conferences, met with
U.S. and foreign officials, raised funds for her think tanks,[5] and testified before Congress as a
policy expert specializing in, among other things, the Korean Peninsula and various regional
issues impacting Asia.  *Id.*; *see also, e.g.*, *id.* ¶¶ 23, 28, 32–33, 35, 46–47.

The Indictment broadly accuses Dr. Terry of working on behalf of the South Korean
government "[f]or more than a decade," and willfully failing to file a FARA registration
statement.  *See id.* ¶ 1.  The Indictment does not, however, contain allegations spanning that
length of time, and contains significant gaps during which it fails to allege even a single activity
that Dr. Terry undertook on the South Korean government's behalf.  Even where the Indictment
does allege activities that Dr. Terry supposedly undertook on behalf of South Korea, it never
specifies which qualifying statutory activity under 22 U.S.C. § 611(c)(1)(i)–(iv) applies, such as

---

[2] When considering an indictment in response to a motion to dismiss, "the Court accepts all pertinent allegations as true."  *United States v. Heicklen*, 858 F. Supp. 2d 256, 263 (S.D.N.Y. 2012).  To be clear, Dr. Terry disputes the truth of numerous allegations in the Indictment.  *See, e.g.*, *infra*, note 9.  For purposes of her motion to dismiss the Indictment, however, Dr. Terry addresses the allegations that the Court must assume as true.

[3] Dr. Terry surrendered her South Korean citizenship when she became a naturalized U.S. citizen in 1985.  Declaration of Dr. Sue Mi Terry ("Terry Decl.") ¶ 1.

[4] Dr. Terry has not held a security clearance since 2011.

[5] The government does not allege that Dr. Terry personally profited from any of the donated funds discussed in the Indictment.

engaging in "political activities," *id.* § 611(c)(1)(i), or acting as a "political consultant," *id.* § 611(c)(1)(ii). Instead, the Indictment divides her alleged work as an unregistered foreign agent into three categories of conduct:

> At the direction of ROK Government officials, [Dr. Terry] [1] advocated ROK policy positions, including in published articles and during media appearances, [2] disclosed nonpublic U.S. Government information to ROK intelligence officers, and [3] facilitated access for ROK Government officials to U.S. Government officials.

*Id.* ¶ 1. The Indictment never alleges that she undertook these activities while under the "control" of the South Korean government or pursuant to any "order[s]." 22 U.S.C. § 611(c)(1). And these allegations are, on their face, untethered from the statutorily enumerated activities.

The Indictment contains no support for the allegations that Dr. Terry "advocated ROK policy positions" to audiences in the U.S. on the South Korean government's behalf, Ind. ¶ 1, as opposed to her simply reporting on facts she learned from sources and sharing her own well-formed views on foreign policy. At the outset, the Indictment alleges that, in October 2013, Dr. Terry asked a South Korean contact who had positions in both the South Korean Embassy and National Intelligence Service ("NIS")—referred to as "NIS Handler-1"[6]—to send her "thoughts/material" on the role of women for the peace and unification of the Korean Peninsula to help her prepare for a speech at an "event involving female Korea experts." *Id.* ¶ 12. The Indictment does not allege that this contact directed or asked Dr. Terry to give the speech or use

---

[6] In just one example of how the Indictment uses inflammatory and inaccurate language to paint a radically misleading picture of Dr. Terry, the government summarily states that "handler" is another term for "primary ROK NIS point of contact." Ind. ¶ 2. However, the government does *not* allege that Dr. Terry (or anyone else for that matter) ever referred to these individuals as "handlers," or that anyone referenced in the Indictment concurs with the government's definition of "handler." The government pulls this unsupported label out of thin air to try to make this case something that it is not, and to elide its myriad shortcomings. Neither Dr. Terry, nor the Court, is bound by the Indictment's conclusory and prejudicial language. *Cf. United States v. Sterritt,* No. 21 Cr. 193 (KAM), 2023 WL 7386660, at *10 (E.D.N.Y. Nov. 8, 2023) (directing parties to "propose[] redactions or modifications to minimize unnecessarily suggestive or potentially prejudicial descriptive terms" in indictment that may be submitted to jury).

his "thoughts/material," or even that Dr. Terry's speech ultimately incorporated them.  *See id.*

The Indictment also alleges that in January 2023, Dr. Terry had dinner with a South Korean Embassy and NIS official, "NIS Chief of Station-2,"[7] and during the meal, NIS Chief of Station-2 shared with Dr. Terry newsworthy information that Dr. Terry later reported in media appearances and in an article that she published in an influential U.S. magazine.  *Id.* ¶ 39.  These alleged facts that NIS Chief of Station-2 shared included that North Korean leader Kim Jong Un had personally observed "a solid fuel engine test," which would be difficult for the United States to detect, *id.* ¶ 40; and that "the current ROK Government 'wants to strengthen extended deterrence,'" and "is now pursuing . . . regular deployment of US strategic assets," such as "nuclear submarine[s] and aircraft carrier[s]," *id.* ¶ 41.  Again, the Indictment does not allege that NIS Chief of Station-2 directed or requested that Dr. Terry repeat this information in U.S. media.  *See id.* ¶¶ 39–41.  Nor does it explain how such basic reporting of facts learned from a source is akin to advocating "ROK policy positions" in the United States.  *See id.*

Even where the Indictment alleges that Dr. Terry shared views on U.S. and South Korean foreign policy in U.S. media that were consistent with the viewpoints shared by NIS Chief of Station-2 or the South Korean government, there are no allegations that Dr. Terry held those views and ultimately shared them *because* NIS Chief of Station-2 or some other South Korean official directed her or requested that she do so.  *See id.* ¶ 39 (failing to allege that Dr. Terry was asked or directed to repeat "talking points on North Korean policy" in U.S. media); *id.* ¶ 41 (failing to allege that Dr. Terry was asked or directed to "recommend[] that the U.S. 'rotat[e] more nuclear-capable U.S. weapons systems into South Korea such as B-52s and F-35s" in an article she wrote for an influential U.S. magazine); *id.* ¶ 42 (failing to allege that Dr. Terry was

---

[7] The Indictment refers to this official as "NIS Handler-3."  Ind. ¶ 8.

asked or directed to "advocate[] for the creation of a U.S.-ROK 'consultative group' on security matters and crisis management" in the same article).

The Indictment cites one instance in which Dr. Terry allegedly wrote an article for U.S. audiences pursuant to a written contract with an arm of the South Korean government, *see id.* ¶ 13 (alleging that Dr. Terry contracted "with the ROK Ministry of Foreign Affairs ('[South Korean] MFA') to write"[8] an article in *Foreign Affairs*, "an influential magazine" of international relations and U.S. foreign policy), but this allegedly occurred in 2014—nearly a decade before the government even initiated this criminal prosecution, *see id.* (alleging Dr. Terry published such article "on or about June 18, 2014").[9]  As for the allegation that Dr. Terry more recently accepted compensation from a South Korean MFA official in April 2023 to write "a short article for a ROK newspaper regarding a visit by the ROK President to the United States, to be followed by an expanded article to be published online," *id.* ¶ 50, the Indictment never alleges that these pieces, written for a Korean-language South Korean newspaper and a scholarly South Korean publication (which paid Dr. Terry a very modest honorarium), were intended to influence, or even be viewed by, the American public or the U.S. government, *see id.* ¶¶ 50–51.

The Indictment also accuses Dr. Terry of disclosing "nonpublic U.S. Government information to ROK intelligence officers" in an introductory paragraph, *id.* ¶ 1, but never specifies which facts undergird this provocative allegation.  A careful review of the Indictment

---

[8] The South Korean MFA is akin to the U.S. Department of State.  *See* https://www.mofa.go.kr/eng/wpge/m_5744/contents.do (last visited Feb. 25, 2025).

[9] While the Court must accept the Indictment's factual allegations as true, the government should have known this allegation is false.  The project for which the South Korean MFA paid Dr. Terry at this time was not for this magazine article, but for an entirely separate policy research report for the MFA and its staff.  In other words, this report was not intended for an American audience.  As Dr. Terry's emails (which were collected and, presumably, reviewed by the government pursuant to a search warrant) make plain, these were unrelated professional projects.  Indeed, the U.S. magazine referenced in the Indictment accepted Dr. Terry's draft article for publication *six months before* she entered into a contract with the South Korean MFA.

lays bare that none of the alleged facts amount to Dr. Terry sharing "nonpublic U.S. Government information."  Indeed, Dr. Terry—who was not a government employee during the period at issue—simply had no "nonpublic U.S. Government information" to share, and the Indictment does not specify any "nonpublic U.S. Government information" that was ever provided to her.  Moreover, there is no allegation that Dr. Terry ever disclosed classified information or any other information that she was contractually or otherwise legally bound not to disclose.[10]  And the Indictment never alleges that any South Korean government official directed or requested that Dr. Terry share such information.  *See id.* ¶¶ 30, 33, 56, 64(l).[11]

In addition, the Indictment accuses Dr. Terry of having "facilitated access for ROK Government officials to U.S. Government officials," *id.* ¶ 1, but it appears that the Indictment's reference to "facilitating access" is mere legalese for making introductions.  In other words, the Indictment accuses Dr. Terry of networking, a core function of any think tanker's professional life.  Notably, the government never alleges that Dr. Terry attempted to connect her South Korean and U.S. contacts with any specific aim of influencing the U.S. public or the U.S. government.[12]  *See id.* ¶¶ 16–18, 20, 28, 34–35, 37, 45–46.  The Indictment attempts to muddy the waters by associating gifts that Dr. Terry received (a coat and two bags) with her routine

[10] *See, e.g.*, *id.* ¶ 30 (merely alleging that Dr. Terry and NIS Chief of Station-2 "discussed . . . [her] close relationship with a senior State Department official with responsibilities covering Korean affairs who had previously served in senior roles at the CIA and at the National Intelligence Council"); *id.* ¶¶ 32–33 (merely alleging that Dr. Terry shared her own notes of an unclassified "meeting" she had with other "Korean policy experts" and the U.S. Secretary of State); *id.* ¶¶ 56, 64(l) (merely alleging that Dr. Terry shared "details of her prior meeting with the U.S. Ambassador to Japan" with NIS Chief of Station-2).

[11] This is yet one more example, among many, of the Indictment employing deeply loaded and misleading language to unfairly malign Dr. Terry and to mask the Indictment's legal inadequacy.  *See supra*, note 6.

[12] The Indictment focuses on an event Dr. Terry organized in 2022 for Congressional staff that was followed by a happy hour, sponsored and attended by ROK officials.  Ind. ¶¶ 37–38.  Although the government accuses Dr. Terry of providing ROK officials "secret access to Congressional staff," the sponsor of this event was no secret.  As the Indictment acknowledges, "Congressional staff members who attended the happy hour received gift bags containing Yeti-brand tumblers and pamphlets *with the logo of the ROK Embassy*."  *Id.* (emphasis added).

attempts to connect her professional contacts with one another. But under scrutiny, these attempts flatly fail. Dr. Terry did not receive any gifts close in time to any of the alleged meetings, and the Indictment fails to allege any causal relationship between the gifts and Dr. Terry's activities. *See id.* ¶¶ 20, 29–30. And importantly, in many of the instances where Dr. Terry allegedly connected her South Korean and U.S. contacts, the government fails to allege that she did so under the direction of, or at the request of, any South Korean government official.[13] Where the Indictment alleges that Dr. Terry connected South Korean government officials with current, incoming, or former U.S. government officials pursuant to a South Korean "request," *id.* ¶¶ 17–18, 20, 37, 45–46, 55, the government never alleges that she attempted to honor these requests because of any sense of obligation she had to the South Korean government or that doing so was not predominantly in her own personal and professional interests. Indeed, these allegations reflect conduct undertaken by scores of uncharged current and former senior U.S. government officials every single day.

Despite never making clear which of the specific activities alleged in the Indictment required Dr. Terry to register under FARA, the government claims that Dr. Terry violated the registration requirement "willfully," warranting federal felony charges. But apart from the Indictment's conclusory allegation that Dr. Terry "knowingly and willfully acted . . . as an agent of a foreign principal," *id.* ¶ 63, the government provides nothing else to support it. That is so because no such evidence exists. Instead, the government merely alleges that Dr. Terry was generally aware of FARA's existence, because, prior to providing congressional testimony, Dr. Terry signed "Truth in Testimony" forms, truthfully stating that she was not an active FARA

---

[13] *See id.* ¶¶ 16, 18 (failing to allege that Dr. Terry tried to contact "Incoming U.S. Official-2" because South Korean officials requested that she do so); *id.* ¶ 28 (failing to allege that Dr. Terry "hosted a private, invitation-only virtual workshop" that had the effect of connecting some South Korean government officials with "U.S. Government officials with responsibilities for North Korea" because South Korean officials requested that she do so).

registrant, and that separately, in November 2022 (*i.e.*, nine years after the first event described

in the Indictment), she attended a FARA training provided by her employer. *Id.* ¶ 61. The

Indictment never alleges that the Department of Justice's ("DOJ") FARA Unit ever engaged with

Dr. Terry, much less issued a "letter of inquiry" to inform her of her potential obligation to

register as a foreign agent because of any of the alleged activities described therein—a common

and standard step taken by the FARA Unit.[14]  Nor does the Indictment allege that Federal Bureau

of Investigation ("FBI") agents ever raised FARA with Dr. Terry, despite its agents asking her

questions about her contacts with South Korean NIS as far back as November 2014.  *See id.* ¶ 14.

And the Indictment never alleges that any existing court decision or advisory opinion from the

DOJ could have put Dr. Terry on notice that her alleged conduct required registration under

FARA.

　　　　The Indictment recycles the above allegations to assert sixteen overt acts in furtherance

of Dr. Terry's alleged conspiracy to violate FARA, *see id.* ¶ 64, but never alleges that any of her

(unidentified) co-conspirators entered into any agreement for Dr. Terry to act on the South

Korean government's behalf without disclosing her status as a foreign agent to the U.S.

government.  *See id.*  Indeed, the Indictment does not allege Dr. Terry's co-conspirators were

aware of FARA's registration requirement at all, much less took any steps to ensure that Dr.

Terry did not register.  *See id.*  And while the Indictment accuses Dr. Terry of one grand

conspiracy to violate FARA, it never provides any allegation suggesting that the South Korean

NIS and MFA officials referenced therein shared the same criminal objective.  In fact, there is no

---

[14] When the DOJ "receives credible information establishing a *prima facie* registration obligation," it "usually sends a letter advising the person of the existence of FARA and the possible obligations thereunder" that "usually cites or provides the information prompting the inquiry," out of concern for establishing "intent."  U.S. Dep't of Just., *U.S. Attorneys' Manual: Criminal Resource Manual* [hereinafter "CRM"] § 2062, https://www.justice.gov/archives/usam/criminal-resource-manual-2062-foreign-agents-registration-act-enforcement (last visited Feb. 25, 2025).

allegation that these two separate and distinct groups of South Korean officials ever interacted with one another or came to any agreement with Dr. Terry to willfully violate FARA.

In short, Dr. Terry did not in fact commit either of the offenses charged, and we expect that a jury would reject the government's claims at trial. But this case should never get that far.

## ARGUMENT

### I.    MOTION TO DISMISS THE INDICTMENT

Under any reasonable interpretation of FARA, the government has failed to allege that Dr. Terry committed a crime. Put differently, under any reasonable interpretation of FARA, Dr. Terry is innocent. That is so because what Dr. Terry did is not criminal—none of it required FARA registration. But even if this Court were to determine that FARA's capacious and vague provisions must be read to encompass her activities as a writer, a think tanker, a foreign policy expert, and a breaking news analyst, the government would still fail to state a "willful[]" violation of the registration requirement. Dr. Terry never knew any of these routine and constitutionally protected activities could have ever required her to register under FARA. That is hardly surprising, as FARA—a notoriously broadly worded statute—does not provide fair notice as to what conduct requires registration, in violation of the Fifth Amendment's right to due process. And by exploiting FARA's inherent vagueness to advance its case against Dr. Terry, the government threatens First Amendment-protected activity everywhere. Compounding these fatal errors, the Indictment attempts an end run around the five-year statute of limitations by joining together at least three distinct periods of possible FARA activity into one grand count. For these reasons and more, the Indictment cannot stand.

### A.    Legal Standard

Before trial, a criminal defendant "may raise . . . any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Accordingly, a

court must accept all the government's factual allegations as true when evaluating a motion to dismiss an indictment. *Heicklen*, 858 F. Supp. 2d at 263. A defendant may move to dismiss an indictment based on "a defect in the indictment," including "failure to state an offense" and "joining two or more offenses in the same count (duplicity)." Fed. R. Crim. P. 12(b)(3)(B).

An indictment must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment fails to state an offense when "it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012). Whether the alleged facts constitute the offense charged is a question of law. *See id.* at 76. "A 'failure to state an offense' argument includes constitutional challenges to the statute creating the charged offenses." *United States v. Nordean*, 579 F. Supp. 3d 28, 40 (D.D.C. 2021). A criminal statute is unconstitutionally vague on its face if it is "so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech." *Winters v. New York*, 333 U.S. 507, 509 (1948).

An indictment is duplicitous if it joins two or more distinct crimes in a single count. *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). The doctrine of duplicity may be invoked when an indictment "implicate[s] a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution." *Id*.

### B.    The Indictment Pursues a Novel Criminal Prosecution That Is Contrary to FARA's Longstanding Purpose—Disclosure of Malign Foreign Influence

In 1938, on the cusp of the Second World War, Congress enacted FARA "[t]o protect the national defense, internal security, and foreign relations of the United States by requiring public disclosure by persons engaging in propaganda activities and other activities for or on behalf of

foreign governments, foreign political parties, and other foreign principals," so that the

government and the people can understand such persons' "statements and actions in the light of

their associations and activities." 83 Cong. Rec. 8021 (1938). At that time, Congress was

particularly concerned with "alien Nazi activities" that were "contrary to the principles" of

democratic government. 79 Cong. Rec. 2668 (1935). Since FARA's passage, Congress has

amended the statute at least twelve times.[15] Nonetheless, the core of the statute has remained the

same—persons defined as "agents" of a "foreign principal" must register with the U.S.

government and disclose to the public the nature of their principal-agent relationship.

Today, FARA provides that "[n]o person shall act as an agent of a foreign principal"

within the United States unless he or she has filed, under oath, "a true and complete registration

statement" with the Attorney General that meets certain specified criteria. 22 U.S.C. § 612(a).

An "agent of a foreign principal" is defined to include "any person who acts as an agent,

representative, employee, or servant, or any person who acts in any other capacity at the order,

request, or under the direction or control, of a foreign principal,"[16] who engages in specified

qualifying activities. *Id.* § 611(c)(1). Such qualifying activities include "engag[ing] within the

United States in political activities for or in the interests of such foreign principal," *id.* §

611(c)(1)(i), and "act[ing] within the United States as a . . . political consultant for or in the

interests of such foreign principal," *id.* § 611(c)(1)(ii). FARA defines "political activities" as:

> [A]ny activity that the person engaging in believes will, or that the
> person intends to, in any way influence any agency or official of the
> Government of the United States or any section of the public within

---

[15] *See* Pub. Law 110-18, 121 Stat. 749 (2007); Pub. Law 105-166, 112 Stat. 39 (1998); Pub. Law 104-65, 109 Stat. 699, 700, 704 (1995); Pub. Law 98-620, 98 Stat. 3359 (1984); Pub. Law 91-375, 84 Stat. 773, 784 (1970); Pub. Law 89-486, 80 Stat. 244 (1966); Pub. Law 87-366, 75 Stat. 784 (1961); Pub. Law 84-893, 70 Stat. 899 (1956); Pub. Law 81-831 § 20, 64 Stat. 1005 (1950); Pub. Law 81-642, 64 Stat. 399-400 (1950); Pub. Law 77-532, 56 Stat. 248–58 (1942); Pub. Law 76-319, 53 Stat. 1244-1246 (1939).

[16] The Second Circuit has construed the statutory term "request" to be more coercive than a mere "plea." *Att'y Gen. of United States v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159, 161 (2d Cir. 1982).

> the United States with reference to formulating, adopting, or
> changing the domestic or foreign policies of the United States or
> with reference to the political or public interests, policies, or
> relations of a government of a foreign country or a foreign political
> party.

*Id.* § 611(o).  The term "political consultant" is defined as "any person who engages in informing

or advising any other person with reference to the domestic or foreign policies of the United

States or the political or public interest, policies, or relations of a foreign country or of a foreign

political party."  *Id.* § 611(p).  Even if a person is deemed to have engaged in a qualifying

activity on behalf of a foreign principal, that person is still exempt from registering under FARA

if she is "engaging in . . . activities not serving predominantly a foreign interest."  *Id.* §

613(d)(2).

      FARA provides the government with two separate remedies to enforce FARA's

registration requirement.  First, the government may file a civil enforcement action in federal

district court to enjoin the agent's conduct on behalf of a foreign principal or to require

compliance with the registration requirement.  *Id.* § 618(f).  Alternatively, and as relevant here,

the government may pursue criminal sanctions against anyone who "willfully violates" the

registration requirement.  *Id.* § 618(a)(1), (2).  The failure to file a registration statement "shall

be considered a continuing offense for as long as such failure exists."  *Id.* § 618(e).  Because

FARA does not specify a statute of limitations, the five-year statute of limitations specified in 18

U.S.C. § 3282 applies, and begins to run "when the agent ceases activities on behalf of the

foreign principal."  *Att'y Gen. of United States v. Wynn*, 104 F.4th 348, 352–53 (D.C. Cir. 2024).

      Since FARA's inception, the government has had the ability to seek criminal penalties to

punish noncompliance with the registration requirement.  However, the DOJ brought only *seven*

criminal FARA cases between 1966 and 2015,[17] opting instead to pursue voluntary compliance through letters of inquiry.[18]  In the following decade, however, the number of criminal FARA prosecutions nearly quadrupled[19] as the DOJ shifted "from treating FARA as an administrative obligation . . . to one that is increasingly an enforcement priority."[20]  From 2021 to 2024, the DOJ initiated numerous criminal prosecutions against unregistered agents who purportedly acted on behalf of the governments of China, Iran, Venezuela, and Russia in order to influence U.S. policy.[21]  Dr. Terry is the first and only defendant to be criminally charged for allegedly acting on behalf of the government of one of the United States' closest democratic allies—South Korea. Indeed, shortly after charging Dr. Terry, the DOJ argued in a separate case involving an individual alleged to have acted as a foreign agent on behalf of the Chinese government that "the purpose of FARA" is "to root out covert *malign* influence efforts by foreign actors to affect or alter U.S. policy."[22]  Accordingly, in addition to criminalizing innocent conduct, Dr. Terry's prosecution is flatly inconsistent with FARA's well-established purpose.

### C.     Count Two Is Defective Because It Fails to State a Willful Violation of FARA

To state a willful violation of FARA's registration requirement, the Indictment must, at the very least, indicate (1) the essential facts that triggered a legal duty to register, and (2) the

---

[17] Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Nat'l Sec. Div.'s Enf't & Admin. of the Foreign Agents Registration Act* (Sept. 7, 2016), at ii, https://oig.justice.gov/reports/audit-national-security-divisions-enforcement-and-administration-foreign-agents (last visited Feb. 25, 2025).

[18] *See* CRM § 2062.

[19] Based on publicly available information, it appears that the DOJ has initiated more than two dozen criminal FARA-related prosecutions since 2015.  Between 1966 and 2015, the DOJ brought a FARA-related prosecution approximately once every seven years.  After 2015, the DOJ brought on average two to three prosecutions *per year*.

[20] Katie Benner, "Justice Dept. to Step Up Enforcement of Foreign Influence Laws," *N.Y. Times* (Mar. 6, 2019), https://www.nytimes.com/2019/03/06/us/politics/fara-task-force-justice-department.html (last visited Feb. 25, 2025).

[21] U.S. Dep't of Just., *Recent Cases: FARA Cases* (Oct. 25, 2024), https://www.justice.gov/nsd-fara/recent-cases (last visited Feb. 25, 2025).

[22] Government's Memorandum of Law in Opposition to Defendant Linda Sun's Pretrial Motion to Dismiss, at 18, *United States v. Sun*, No. 24 Cr. 346 (E.D.N.Y. filed Dec. 4, 2024) (emphasis added).

essential facts demonstrating a willful violation.  On both fronts, Count Two fails.

        1.     <u>Dr. Terry Never Had a Legal Duty to Register Under FARA</u>

            *a.    Dr. Terry Exchanged Information with the South Korean Government on Her Own Accord*

As a matter of law, none of the Indictment's allegations about Dr. Terry sharing "nonpublic U.S. government information"[23] with South Korean officials could have triggered her obligation to register under FARA.  That is because in each instance where Dr. Terry is alleged to have shared any information at all, *see* Ind. ¶¶ 30, 32–33, 56, the government fails to allege that Dr. Terry undertook a specific course of action to provide such information to South Korean officials under their "direction" or "control," or even at their "request," *see* 22 U.S.C. § 611(c)(1).  Without alleging such basic facts, the Indictment necessarily fails to state the requisite agency relationship that would have triggered Dr. Terry's legal duty to register under FARA when she exchanged information with South Korean officials.  Even per the government's own allegations, Dr. Terry shared this information with South Korean officials on her own accord.

The allegation that NIS Chief of Station-2 "asked" Dr. Terry "to share details of her prior meeting with the U.S. Ambassador to Japan, and that [she] did so," Ind. ¶ 56, still misses the mark.  That is because the Second Circuit has cautioned that the statutory term "request" should "not [] be understood in its most precatory sense[,]" as "[s]uch an interpretation would sweep within the statute's scope many forms of conduct that Congress did not intend to regulate."  *Att'y Gen. of United States v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159, 161 (2d Cir. 1982).

---

[23] As explained in the summary of the Indictment, *see* § II, *supra*, the Indictment never identifies any information Dr. Terry allegedly disclosed that could possibly qualify as "nonpublic U.S. Government information."  Nor does the Indictment explain how the description of that information as being "nonpublic" and/or "government information" has any relevance to whether Dr. Terry had an obligation to register under FARA.

Although "[t]he exact perimeters of a 'request' under the Act are difficult to locate," the Second Circuit has construed the term "request" to be more coercive than a "plea," *id.*, and thus certainly more coercive than a mere "ask."  Instead, the Second Circuit has stated that a "request" under the statute is more akin to a specific instruction.  *Id.* at 162.  Put simply, "[o]nce a foreign principal establishes a particular course of conduct to be followed, those who respond to its 'request' for complying action may properly be found to be agents under the Act."  *Id.*

Based on the Second Circuit's binding construction of the statute, the Indictment's allegation that Dr. Terry simply responded to a question posed by NIS Chief of Station-2 about a meeting she attended with the U.S. Ambassador to Japan is legally insufficient to establish agency under the statute.  To conclude otherwise would be absurd, as it would require U.S. citizens who engage in routine conversations with foreign nationals on matters of U.S. policy to register with the Attorney General of the United States as foreign agents.

> b.    *Dr. Terry Networked with Her Professional Contacts*

The allegation that Dr. Terry "facilitated access for ROK Government officials to U.S. Government officials," Ind. ¶ 1, similarly fails to establish that she ever had a legal duty to register under FARA.  At the threshold, the government fails to state which statutory qualifying activity under 22 U.S.C. § 611(c)(1)(i)–(iv) could even apply to the allegations of "facilitate[ing] access" to U.S. government officials—a necessary element for demonstrating that Dr. Terry had an obligation to register.  That failure alone—*i.e.*, the failure to track the language of the statute charged—is sufficient to warrant dismissal.  *See United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 303 (S.D.N.Y. 2023) (requiring, at the very least, an indictment "to track the language of the statute charged" to state an offense within the terms of the applicable statute).  Notably, the facts as alleged are insufficient as a matter of law to characterize Dr. Terry's networking activities as "political activities" under 22 U.S.C. § 611(c)(1)(i), as there are no accompanying

allegations that Dr. Terry engaged in these activities with the belief that they would, or with the intent to, influence U.S. policy.  *See id.* § 611(o) (defining "political activities"); *see also* 28 C.F.R. § 5.100(f) (further defining "domestic or foreign policies of the United States").  Without that key statutory requirement, the Indictment necessarily fails to state that Dr. Terry ever had an obligation to register under FARA for her routine networking activities.

Moreover, the Indictment fails to provide essential facts demonstrating that any of these networking activities were undertaken by Dr. Terry pursuant to the agency relationship contemplated by FARA.  For instance, when Dr. Terry tried to honor "requests" from South Korean officials in 2016 and 2018-19 to be put in touch with former, current, or incoming U.S. government officials, *see* Ind. ¶¶ 17–18, 20, the Indictment does not allege that she was acting pursuant to instructive "requests" as the Second Circuit has narrowed that term.  *See INAC*, 668 F.2d at 160–61.  During this time, there are no allegations that anyone in the South Korean government ever compensated her to comply with what were, simply put, innocuous inquiries. *See* Ind. ¶¶ 24–25 (the earliest allegation that a South Korean official gave Dr. Terry a gift was eleven months *after* Dr. Terry set up these meetings); *cf. United States v. Silver*, 948 F.3d 538, 558 (2d Cir. 2020) (requiring that "a particular question or matter must be identified at the time the official makes a promise or accepts a [benefit]" to show an illegal quid pro quo).  Nor is there any allegation in the Indictment that Dr. Terry honored these requests in 2016 and 2018-19 to "serv[e] predominantly" the interests of the South Korean government, 22 U.S.C. § 613(d)(2), as opposed to her own personal and professional interests.

As for the allegation that Dr. Terry tried to contact another incoming U.S. national security official to put him in touch with his South Korean MFA counterpart in late 2016, Ind. ¶¶ 16–18 ("Incoming U.S. Official-2"), the Indictment again fails to allege Dr. Terry did so under

the MFA official's "direction" or "control," or even at his "request." 22 U.S.C. § 611(c)(1).  The

same can be said for the allegation that Dr. Terry hosted a private workshop that included U.S.

and South Korean government officials, among others, in late 2020.[24]  *See* Ind. ¶ 28.  And in the

instances where Indictment alleges that Dr. Terry connected South Korean government officials

with current, incoming, or former U.S. government officials at the "request" of South Korean

government officials in 2022 and 2023 through think tank and networking events, *see id.* ¶¶ 45–

46, 55, the Indictment again fails to allege that such "requests" fell "somewhere between a

command and plea," *INAC*, 668 F.2d at 161, or that Dr. Terry was honoring such requests to

"serv[e] predominantly" the interests of the South Korean government, 22 U.S.C. § 613(d)(2), as

opposed to her own personal and professional interests or the interests of her think tank

employer.  Accordingly, even if the government can prove the facts regarding Dr. Terry's

networking activities to be true, those facts are legally insufficient to show that she had any duty

to register under FARA.

### c.    Dr. Terry's Policy Positions Were Her Own

Finally, the Indictment fails to provide essential facts showing that Dr. Terry's policy

advocacy could have triggered her obligation to register under FARA.  The October 2013

allegations about Dr. Terry soliciting input from an NIS intelligence official for a speech on the

role of women does not feature a single allegation that the intelligence official instructed she

incorporate his offered talking points into her speech or that she ultimately gave a speech

incorporating those points.  *See* Ind. ¶ 12.  One does not become a foreign agent simply by

consulting foreign sources; to hold otherwise would infringe upon routine journalistic activity

---

[24] Also in attendance were "senior leaders at private companies, non-profit organizations, think tanks, [and] academic institutions."  Ind. ¶ 28.

that is protected by the First Amendment.[25]

The same can be said for the March 2023 allegations about Dr. Terry's co-authored article in a major U.S. publication. *See id.* ¶¶ 48–49. The allegations that Dr. Terry received personal gifts and donations for the think tank where she was employed have nothing to do with the South Korean MFA official who allegedly requested that she publish that article. Such allegations cannot plausibly be construed as "payments" for writing that article. *See Silver*, 948 F.3d at 558. And merely alleging that the content of the article "was broadly consistent with" the South Korean MFA official's responses to Dr. Terry's journalistic "questions [for him] about ROK-Japan relations," Ind. ¶¶ 48–49, is a far cry from, and legally distinct from, trumpeting official talking points about South Korea-Japan relations at the behest of the South Korean government. Rather, what the government alleges is routine journalistic conduct. Again, the Court cannot construe FARA's registration obligation to include First Amendment activity. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict.").

As for the allegation that at a January 2023 dinner, NIS Chief of Station-2 shared information with Dr. Terry about "North Korean policy," which she allegedly repeated in media appearances and in an article that she published in the same magazine as above, *see* Ind. ¶ 39, the Indictment never alleges that NIS Chief of Station-2 directed or otherwise instructed or requested that Dr. Terry repeat the information in U.S. media. *See id.* And as for the April 2023 allegation that Dr. Terry accepted compensation from a South Korean MFA official to write "a short article for a [South Korean] newspaper regarding a visit by the [South Korean] President to the United

---

[25] *See generally Guan v. Mayorkas*, 530 F. Supp. 3d 237, 266 (E.D.N.Y. 2021) (neither party disputing that plaintiffs "were exercising their First Amendment rights when reporting on migrant conditions at the border and associating with other members of the media, as well as their sources"); *The New York Times Co. v. Gonzales*, 459 F.3d 160, 168 (2d Cir. 2006) (acknowledging common law and First Amendment protections for reporters).

States" and a longer online version, the Indictment never alleges that these articles, written for a modest honorarium paid by a Korean-language South Korean newspaper and a South Korean scholarly publication, were intended to influence the American public or the U.S. government. *See id.* ¶¶ 50–51.

2.    <u>The Indictment Fails to Allege that Dr. Terry Acted Willfully</u>

Since FARA criminalizes the "willful violation" of its provisions, 22 U.S.C. § 618(a)(1), an indictment charging a FARA violation must allege that the defendant had actual and specific knowledge of her legal duty to register under the Act on account of her conduct, and that she voluntarily and intentionally violated that known duty.  Not only does the Indictment lack essential facts showing Dr. Terry ever had a duty to register under FARA, it also fails to allege that she willfully violated that duty.  There is no allegation in the Indictment that Dr. Terry ever knew she was supposed to register under FARA because of her alleged activities.  The Indictment merely states that Dr. Terry (1) truthfully told Congress on three separate occasions that she was not an active registrant under FARA and (2) received training on FARA in connection with her employment in late 2022, long after virtually all of the activities alleged in the Indictment transpired.  *See* Ind. ¶ 61.  Absent any allegations of willfulness, the Indictment necessarily fails to state a criminal offense.

a.    *FARA's Plain Language Requires Enhanced Culpability*

FARA criminalizes the "willful violation" of its provisions.  22 U.S.C. § 618(a)(1).  The term "willfully" connotes "a voluntary, intentional violation of a known legal duty."  *Cheek v. United States*, 498 U.S. 192, 200 (1991) (quoting *United States v. Bishop*, 412 U.S. 346, 360 (1973)).  Moreover, a willful violation requires "bad faith or evil intent."  *Bishop*, 412 U.S. at 360.  While "[m]ost criminal prohibitions require only proof that the crime was committed 'knowingly,' meaning that the defendant knew of the facts that made his act illegal," Congress

- 21 -

has required a higher showing of "willfulness" when it "wants to ensure that defendants will be convicted only if they have a more culpable state of mind." *United States v. Burden*, 934 F.3d 675, 690 (D.C. Cir. 2019) (citing *Bryan v. United States*, 524 U.S. 184, 191–92 (1998)).

Requiring willfulness is a vital safeguard to "separate those who understand the wrongful nature of their act from those who do not." *Rehaif v. United States*, 588 U.S. 225, 231 (2019) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 n.3 (1994)). And while it is true that "ignorance of the law" is generally "no excuse," even for "willful" violations of the law, *Bryan*, 524 U.S. at 195–96, a heightened standard of willfulness, demanding "knowledge of the [specific] law" that one is violating, is appropriate where a "highly technical statute" prohibits "apparently innocent conduct," *id.* at 194, or where the conduct prohibited by statute is not readily "definite and knowable," *Cheek*, 498 U.S. at 199. FARA is one such statute.

> b.    *Courts Require Specific Awareness in Statutes Analogous to FARA*

The Supreme Court's application of this principle to criminal tax liability is instructive. In *Cheek v. United States*, the Court required the government to show that a defendant who failed to file income tax on his wages as an airline pilot had "actual knowledge of the pertinent legal duty" to pay such tax to show willful tax evasion. 498 U.S. at 202. Put simply, if the defendant "truly believed that the Internal Revenue Code did not treat wages as income, and the jury believed him," the government would have failed to prove willful tax evasion. *Id.* The Court's reasoning for applying a heightened standard of willfulness to tax evasion is squarely applicable to FARA. Just like the proliferation of modern statutes and regulations the Supreme Court referenced in *Cheek*, FARA makes "it difficult for the average citizen know and comprehend the

extent of the dut[y]" to register as a foreign agent. *Id.* at 199–200.[26]  Surely, in enacting FARA,

Congress "did not intend that a person, by reason of a bona fide misunderstanding as to his . . .

duty to" register under the statute "should become a criminal by his mere failure to measure up

to the prescribed standard of conduct." *Id.* at 200.

The Eleventh Circuit's persuasive interpretation of "willfulness" under the Arms Export

Control Act ("AECA"), 22 U.S.C. § 2278, in *United States v. Adames* is also instructive. *See*

878 F.2d 1374 (11th Cir. 1989).  Just as FARA provides that "every person who becomes an

agent of a foreign principal shall" register as a foreign agent with the Attorney General, 22

U.S.C. § 612(a), the ACEA provides that "every person . . . who engages in the business of . . .

exporting . . . any defense articles . . . designated by the President" on the U.S. Munitions List

"shall register with" the State Department's Office of Munitions Control, 22 U.S.C. §

2778(b)(1)(A)(i).  In interpreting a willful violation of the latter, the Eleventh Circuit concluded

that it required a showing that the defendant "intentionally violated a known legal duty not to

export the firearms" without registration "or purposefully perpetuated her ignorance of the

AECA to avoid criminal liability." *Adames*, 878 F.3d at 1377.  That is "[b]ecause the items

covered by the statute are spelled out in administrative regulations and include items not known

generally to be controlled by the government." *Id.* (internal quotation marks omitted).  Like the

AECA, FARA contains administrative exemptions that are wholly within the control of the

government. *See, e.g.*, 22 U.S.C. § 613(f) (exempting agents of governments of foreign

countries "the defense of which the President deems vital to the defense of the United States").

---

[26] *See also* Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed. Reg. 40 (proposed Jan. 2, 2025) (to be codified at 28 C.F.R. Pt. 5) [hereinafter "NPRM"] at 7–9 (acknowledging that "analyzing" whether an individual has a duty to register under FARA "is a fact-intensive exercise better suited to the advisory-opinion process, where persons who are unclear as to the applicability of the Act can seek and receive definitive guidance as to whether they have a registration obligation").

Absent a showing that a defendant (1) "intentionally violated a known legal duty not to" engage in specified qualifying activity under FARA on behalf of a foreign agent without registering with the Attorney General or (2) "purposefully perpetuated her ignorance of [FARA's registration requirement] to avoid criminal liability," *Adames*, 878 F.3d at 1377, there can be no willful violation of the requirement.

The Second Circuit's interpretation of the Child Support Recovery Act ("CSRA"), 18 U.S.C. § 228, in *United States v. Mattice*, provides further support for a heightened willfulness standard here. *See* 186 F.3d 219 (2d Cir. 1999). Just as FARA criminalizes "willful" failures to register as a foreign agent, the CSRA criminalizes "willfully failing to pay a past due child support obligation." *Id.* at 221. The Second Circuit, after invoking the Supreme Court's heightened willfulness constructions from *Cheek* (among others), held that "the government must prove that the defendant voluntarily and intentionally violated a known legal duty to pay child support." *Id.* at 232. To satisfy willfulness, the government had to allege "that the defendant knew he was violating the state court or administrative order that imposed the [child] support obligation at issue." *Id.* Similarly, to state a willful violation of FARA, the government must state that Dr. Terry had actual knowledge of her alleged duty to register and that she intentionally violated that specific duty—something the Indictment utterly fails to do.[27]

     *c.*    *Specific Awareness Is Consistent with FARA's Primary Purpose*

FARA is precisely the kind of complex registration scheme for which willfulness requires

---

[27] To the extent the Court has any lingering doubts about what is required to state a "willful" failure to register under FARA, the rule of lenity requires that those doubts be resolved in favor of the defendant by adopting Dr. Terry's proposed construction of willfulness. *See Ratzlaf v. United States*, 510 U.S. 135, 148 (1994) ("Moreover, were we to find [the statute's] 'willfulness' requirement ambiguous . . . we would resolve any doubt in favor of the defendant."); *Hughey v. United States*, 495 U.S. 411, 422 (1990) (lenity principles "demand resolution of ambiguities in criminal statutes in favor of the defendant"); *United States v. Bass*, 404 U.S. 336, 347–50 (1971) (rule of lenity premised on concept that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed" (quotation marks omitted)).

specific knowledge. *See Viereck v. United States*, 318 U.S. 236, 241–42 (1943) (stating that FARA "require[s] registration of agents for foreign principals" and "[p]enal sanctions attach . . . for willful failure to file a statement when required"); *United States v. McGoff*, 831 F.2d 1071, 1075 (D.C. Cir. 1987) ("FARA thus creates a comprehensive regulatory scheme for foreign agent registration.").  Liability under FARA hinges on unique obligations that are purely statutory and regulatory and not discernable by resorting to principles long understood at common law.  Moreover, the DOJ, in describing its process of sending "letters of inquiry" to ostensible FARA violators, declared that "FARA, after all, is a *malum prohibitum* enactment not well known outside the legal/lobbying community."[28]

Furthermore, eliminating the requirement of specific knowledge of the duty to register would run afoul of Congress' aim in enacting FARA in the first place—i.e., promoting contemporaneous disclosure of covered foreign agency relationships—because *ex post* criminal prosecution comes too late to ensure *ex ante disclosure*.  According to the DOJ, "even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure."[29]

### D.    Criminal Penalties for Violating FARA Are Facially Void for Vagueness

Dr. Terry also requests that the Court dismiss the Indictment on the ground that criminal prosecutions for violating FARA's registration requirement are facially unconstitutional under the First and Fourteenth Amendment's void for vagueness doctrine.  Such relief is especially warranted if the Court declines to adopt the heightened standard of willfulness requested above.

---

[28] CRM § 2062.

[29] Off. of the Inspector Gen., U.S. Dep't of Just., *Audit of the Nat'l Sec. Div.'s Enf't & Admin. of the Foreign Agents Registration Act* (Sept. 7, 2016), at ii, https://oig.justice.gov/reports/audit-national-security-divisions-enforcement-and-administration-foreign-agents (last visited Feb. 25, 2025); *see also supra*, note 14; *cf. United States v. Mancuso*, 420 F.2d 556, 558–59 (2d Cir. 1970) ("On practical, purposive grounds, it is difficult to understand how elimination of the requirement of knowledge would have furthered the Congressional aim.").

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.* "It requires the invalidation of laws that are impermissibly vague." *Id.* "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (internal quotation marks omitted). A criminal provision is subject to a facial void-for-vagueness challenge if the "deterrent effect on legitimate expression" caused by the provision's vagueness "is . . . both real and substantial, and if the statute is [not] readily subject to a narrowing construction by the . . . courts." *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (internal quotation marks omitted); *see also Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965); *Winters*, 333 U.S at 509.

FARA's provisions defining an "agent of a foreign principal" are unconstitutionally vague. The DOJ has effectively conceded that FARA, through its broad statutory terms and sparse regulations on the scope of agency and qualifying activity under the statute,[30] fails to provide individuals and organizations with fair notice of what conduct requires registration, and instead directs that potential registrants rely on the advisory-opinion process for guidance.[31] *See, e.g.*, NPRM at 7–9. An individual's failure to identify and ultimately register oneself as a foreign agent therefore cannot form the basis of a criminal prosecution without running afoul of

---

[30] *See generally* 28 C.F.R. §§ 5.1 *et seq.*

[31] Advisory opinions issued pursuant to FARA's implementing regulations merely constitute "a statement of the present enforcement intentions of the [DOJ] under the Act." 28 C.F.R. § 5.2(a). They do not represent definitive, binding interpretations of FARA's reach.

basic due process principles.

Moreover, the inherent vagueness in FARA's definition of an "agent of a foreign principal" is evident throughout the Indictment itself: While Dr. Terry maintains that none of her actual conduct required registration under FARA, an ordinary person of reasonable intelligence reviewing the Indictment could not reasonably determine whether the alleged conduct would have triggered the obligation to register under FARA, which until recently was rarely enforced. For instance, the Second Circuit has expressly stated that "[t]he exact perimeters of a 'request' under the Act are difficult to locate." *INAC*, 668 F.2d at 161. The same could be said for what it means to act "under the direction of" a foreign principal.[32] Rather than issuing further clarifying regulations clearly delineating the scope of agency under FARA, the DOJ has instead opted to leave that "fact-intensive inquiry" to the issuance of further advisory opinions. NPRM at 7–9.

Nor do the regulations clarify when an individual who engages in political activities on behalf of a foreign government is eligible for the "not serving predominantly a foreign interest" exemption codified at 22 U.S.C. § 613(d)(2)—an exemption that could plausibly apply to every activity alleged in the Indictment because each one served to advance Dr. Terry's personal and professional goals. *See* 28 C.F.R. § 5.304(c) (merely clarifying when "a person engaged in political activities on behalf of a foreign *corporation*" may benefit from the exemption (emphasis added)). Nor do any court decisions or regulations provide meaningful clarity to the overly broad and vague definitions of "political activities" and "political consult[ing]" under the statute, the latter of which could be read to sweep up any exchange of information with a foreigner about domestic or international politics. *See id.* § 611(p) (defining a "political consultant" to include

---

[32] *Compare* "Direction," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/direction (last visited Feb. 25, 2025) (providing definition of "direction" as "an explicit instruction"), *with* "Direction," *Dictionary.com*, https://www.dictionary.com/browse/direction (last visited Feb. 25, 2025) (providing definition of "direction" as mere "guidance").

"any person who engages in informing . . . any other person" about the policies of the United States and "the political or public interest, policies, or relations of a foreign country or of a foreign political party").

Concerns about FARA's vagueness have only deepened since the DOJ started enforcing the statute more aggressively in the last decade—an effort that began several years after the government alleges that Dr. Terry first conspired with others to willfully violate FARA. Many individuals and organizations have voiced concerns to the DOJ, asking for clarifying regulations to help them determine whether their conduct requires registration,[33] but the DOJ has for the most part declined, opting instead to preserve maximum discretion in how FARA is interpreted and enforced.

Accordingly, the Court should entertain a facial challenge to FARA and strike down the provision, 22 U.S.C. § 618(a)(1), that allows the government to criminally prosecute individuals who fail to register as foreign agents. There is little doubt that the qualifying activities under FARA implicate First Amendment protected activity, particularly "political activities" and "political consult[ing]." The Indictment itself demonstrates FARA's infringement on free speech and association: Dr. Terry, a scholar, and researcher and news analyst who focuses on South Korean affairs, researched, dialogued, and associated with others in her field and area of specialty, received and exchanged unclassified and categorically innocuous information with them, and advocated for her own independently-chosen policy positions, and yet is facing criminal prosecution for these activities. Other individuals and organizations have been ringing

---

[33] *See, e.g.*, InterAction, *An Open Letter to the Congress concerning Foreign Agent Registration Act* (April 23, 2018), https://www.interaction.org/wp-content/uploads/2018/05/interaction_-_open_letter_to_congress_on_foreign_agent_registration_act_-_4.23.2018_1.pdf (last visited Feb. 25, 2025) ("[W]e urge Members of Congress to consider clarifying and updating language, terminology, and definitions contained within FARA that adversely impact our community.").

the alarm bells for years about how aggressive FARA enforcement substantially chills protected expression.[34]  Further, the Court need not search far to find threats of FARA enforcement being used by both sides of the political aisle in possibly arbitrary and discriminatory ways.[35]  While there certainly are valid applications of FARA's registration requirement, criminal prosecutions under circumstances such as these pose a real and substantial threat of chilling protected speech of third parties and, accordingly, cannot stand.  Therefore, the Court must strike down the provision that creates criminal liability for failing to register under FARA.

If the Court declines to do so, the Court at the very least must adopt a narrowing construction of that provision to remedy the aforementioned due process and First Amendment concerns.  *Cf. Hansen*, 599 U.S. at 781 (declining to strike down a criminal statute on First Amendment overbreadth grounds in favor of adopting a narrowing construction of the statute's reach). Here, by holding that FARA's willfulness provision requires that the government show that Dr. Terry was (1) subjectively aware that she had a duty to register under FARA because of her alleged activities but (2) chose not to register anyways, *see supra*, § I.C.2, the Court can reduce the chances that individuals who did not have clear notice that their conduct rendered

---

[34] *See, e.g.*, Michael Castrovilla, "The Inherently Political Nature of the Foreign Agents Registration Act: A Statute in Need of Improvement," 10 *Nat'l Sec. L.J.* 176 (2023); Monica Romero, Comment, "How Far Will FARA Go? The Foreign Agents Registration Act and the Criminalization of Global Human Rights Advocacy," 96 *Wash. L. Rev.* 695 (2021); Nick Robinson, "'Foreign Agents' in an Interconnected World: FARA and the Weaponization of Transparency," 69 *Duke L.J.* 1075 (2020).

[35] For instance, "in 2018, the chairman of the House Natural Resources Committee investigated four prominent U.S. environmental groups . . . as potential 'foreign agents' based on these organizations' cross-border connections and criticisms of U.S. environmental policy."  Robinson, *supra*, note 34, at 1082.  More recently, in 2024, prominent Democratic legislators on Capitol Hill wrote to then-Attorney General Merrick Garland to urge the DOJ to investigate President Trump's son-in-law, Jared Kushner, for possible FARA violations concerning his contacts with the Kingdom of Saudi Arabia and high-profile U.S. government officials.  *See* Letter from Ron Wyden & Jamie Raskin to Merrick Garland (Oct. 24, 2024), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/Letter%20to%20DOJ%20on%20Kushner%20-%20FARA%20%28Wyden%20-%20Raskin%29%20final.pdf (last visited Feb. 25, 2025).  For further analysis of how FARA's vagueness can encourage arbitrary and discriminatory enforcement efforts, *see* Robinson, *supra*, note 34, at 1116–30; Castrovilla, *supra*, note 34, at 192–206.

them a foreign agent would be prosecuted, thereby reducing the chilling effect on protected First Amendment activity. Only clear-cut, willful attempts to circumvent FARA's registration requirement should ever serve as a basis for criminal liability. After all, FARA at its core is a disclosure statute—something the DOJ recognized for decades before embarking upon its recent efforts to push the statute far beyond its intended scope.

In sum, this Court should dismiss both counts of the Indictment because criminal prosecutions for failing to register under FARA are facially void for vagueness.

**E.     FARA's Definitions of "Political Activities" and "Political Consult[ing]" Are Void for Vagueness as Applied to the Allegations in the Indictment**

Regardless of how the Court construes FARA's willfulness provision and addresses Dr. Terry's facial challenge to the statute, the Court must dismiss the Indictment for the independent reason that the only two qualifying activities under FARA that could possibly apply to Dr. Terry's activities alleged in the Indictment, *see* 22 U.S.C. § 611(c)(1)(i)–(ii) ("political activities" and "political consult[ing]"), are unconstitutionally vague as applied.

In *United States v. Sattar*, 272 F. Supp. 2d 348, 356 (S.D.N.Y. 2003), the court dismissed material support for terrorism charges (and related conspiracy charges) before trial because 18 U.S.C. § 2339B's prohibition on "providing" material support in the form of "communications equipment" and "personnel" were unconstitutionally vague as applied to the allegations in the indictment. The court found that the statute did not give reasonable people fair notice that "merely using communications equipment in furtherance of a[] [foreign terrorist organization's] goals," as alleged in the indictment, "constituted criminal conduct." *Id.* at 358. The court also found that the statute failed to clarify what constituted providing "personnel" to a foreign terrorist organization, specifically (1) whether providing legal counsel to an alleged leader of a foreign terrorist organization government, as alleged in the indictment, was criminal under the

statute, and (2) whether mere membership in such an organization, as alleged in the indictment, was criminal under the statute. *See id.* at 358–61. While the court did not strike down the statute as facially unconstitutional, it still dismissed the relevant counts in the indictment because the statute giving rise to those counts was vague as applied to the supporting allegations in the indictment. *See id.* at 361–62.

That reasoning applies with even greater force here. As explained above, the Indictment seeks to hold Dr. Terry criminally liable for sharing details of her exchanges with other Korea experts and U.S. government officials with her contacts from South Korea. *See* Ind. ¶¶ 30, 32–33, 56, 64(l). In doing so, the Indictment appears to advance the broadest possible reading of FARA's vague definition of a "political consultant," which covers "any person who engages in informing . . . any other person" about "the domestic or foreign policies of the United States or the political or public interest, policies, or relations of a foreign country or of a foreign political party." 22 U.S.C. § 611(p). Under that broad reading, any U.S. citizen who engages in conversations with foreigners about U.S. policy or foreign countries or relays details from prior conversations related to such topics could face indictment under FARA if they fail to register with the Attorney General. A reasonable person in Dr. Terry's shoes could not have known such conduct was criminal under FARA.

The same can be said for the Indictment's attempt to criminalize Dr. Terry's advocacy of her own policy views, *see, e.g.*, Ind. ¶ 49, and her efforts to connect her professional contacts with one another, *see id.* ¶¶ 16–18, 26–28, 34–36, 37. The Indictment never alleges that Dr. Terry undertook any activity with the subjective "belie[f]" that the activity would influence U.S. policy or the American public's views on such policy, or that she had the "inten[t]" to do so. 22 U.S.C. § 611(o) (defining "political activities"). The only plausible excuse for that pleading

failure is that the government believes that any activity that could plausibly have any future effect on U.S. foreign policy or the public's views on such policy, no matter how indirect or insignificant, necessarily qualifies as "political activities" under the statute. That broad reading is certainly possible under FARA's vague definition of such activities, but that is all the more reason for this Court to conclude that the statute fails to give fair notice to a reasonable person in Dr. Terry's shoes that her activities alleged in the Indictment are criminal.

Accordingly, this Court should dismiss both counts of the Indictment because FARA fails to provide fair notice that the activities as alleged are qualifying activities under the statute.[36]

### F.    Count Two Is Defective Because It Is Duplicitous

The charge alleging a willful violation of FARA's registration requirement must also be dismissed because it is duplicitous. There are significant gaps of time in which the government fails to allege any activities that Dr. Terry undertook on behalf of the South Korean government, for instance, between June 2014 and December 2016, and between December 2016 and late 2018. During those gaps, Dr. Terry could not have been under an ongoing obligation to register as a foreign agent because she was not engaging in any conduct that could plausibly require registration under FARA. *See Wynn*, 104 F.4th at 352–53 (reaffirming that "the statutory obligation to file expires when the agent ceases activities on behalf of the foreign principal" and "that moment is when the statute-of-limitations clock starts to run"). The Indictment is therefore defective because it groups together at least three distinct periods or instances of possible FARA activity into one grand count, resulting in clear prejudice to Dr. Terry. By lodging a duplicitous

---

[36] Should this case survive Dr. Terry's constitutional challenges to the Indictment, Dr. Terry reserves the right to move for a Rule 29 judgment of acquittal after full factual development at trial, in which she may argue that a conviction under FARA violates the First Amendment as applied to her, including that the registration requirement as applied to her is unconstitutional compelled speech and that the government's prosecution has unconstitutionally interfered with the exercise of her First Amendment rights.

Indictment, the government has attempted an end-run around the five-year statute of limitations. For these reasons, prosecuting Dr. Terry for failing to register as a result of any of her conduct preceding July 2019 cannot proceed.[37]

### G.    Count One (Conspiracy) Fails for the Same Defects

The conspiracy count must also be dismissed.  To be guilty of conspiracy, there must be "(1) an agreement among two or more persons, the object of which is an offense against the United States; (2) the defendant's knowing and willful joinder in that conspiracy; and (3) commission of an overt act in furtherance of the conspiracy by at least one of the alleged co-conspirators."  *United States v. Svoboda*, 347 F.3d 471, 476 (2d Cir. 2003).  To satisfy those elements, "[t]he partners in the criminal plan must agree to pursue the same criminal objective," *Salinas v. United States*, 522 U.S. 52, 63–64 (1997), and there must be "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense,'" *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (quoting *Salinas*, 522 U.S. at 65).  These key elements are not present on the face of the Indictment.

There is no allegation that any of the possible co-conspirators—the NIS officers or the South Korean MFA officials—were ever aware of the obligation for persons like Dr. Terry to disclose their status as foreign agents to the government, let alone that they agreed that Dr. Terry should evade it.  Conspiracy, however, requires "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense.'"[38]

---

[37] Notably, Count Two of the Indictment does *not* charge Dr. Terry with having "agree[d], consent[ed], assume[d] or purport[ed] to act as . . . an agent of" the South Korean government under 22 U.S.C. § 611(c)(2).  Rather, the Indictment only pursues a FARA charge pursuant to subsection (c)(1), where FARA's agency requirement is met by undertaking certain acts or causing others to act as an agent of a foreign principal.  *See* Ind. ¶ 66.

[38] For precisely this reason, the Indictment's failure to allege any violation of a "known legal duty," *Cheek*, 498 U.S. at 201, takes on even greater significance in the conspiracy context—another specific intent offense.  Dr. Terry could not, as alleged, agree with others to violate FARA unless she knew that it existed and imposed on her an obligation to register.  The Indictment does not allege that she specifically knew either of those things.

*Ocasio*, 578 U.S. at 287 (quoting *Salinas*, 522 U.S. at 65).  The Indictment's failure to allege any

facts regarding an agreement to willfully violate FARA's registration requirement is insufficient

to sustain a purported conspiracy charge with the NIS officers or the South Korean MFA.

Second, the conspiracy count is duplicitous in that it improperly joins any potential

conspiracy between Dr. Terry and South Korean NIS with any potential conspiracy between Dr.

Terry and South Korean MFA, thereby alleging "multiple separate and distinct conspiracies in a

single count."  *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).  There is no

allegation in the Indictment that the NIS officers shared the same criminal objective as the MFA

officials or that they all jointly agreed for Dr. Terry not to disclose her alleged status as a foreign

agent to the U.S. government.  Thus, there is no allegation in the Indictment of "mutual

dependence among the participants" in the supposed conspiracy, *United States v. Geibel*, 369

F.3d 682, 692 (2d Cir. 2004) (quoting *United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000)),

nor any facts alleged to suggest that members of the purported conspiracy agreed to join "what

he [or she] knew to be a collective venture directed toward a common goal."  *United States v.*

*Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (quoting *United States v. Berger*, 224 F.3d 107, 114 (2d

Cir. 2000)).  In fact, there is not a single allegation that the NIS officers ever interacted with the

MFA officials or communicated with each other about Dr. Terry.  Count One should therefore be

dismissed along with Count Two, thereby ending this case.

## II.    <u>MOTION FOR A BILL OF PARTICULARS</u>

In the alternative, if the Court declines to dismiss the Indictment in its entirety, Dr. Terry

respectfully moves for a bill of particulars so that she may mount an adequate defense.[39, 40]  *See* Fed. R. Crim. P. 7(f).

### A.    Legal Standard

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).  A bill of particulars is required where an indictment fails to "advise the defendant of the specific acts of which he is accused."  *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *see also United States v. Davidoff*, 845 F.2d 1151, 1154–55 (2d Cir. 1988).  "[I]f necessary to give the defendant enough information about the charge to prepare his defense, [a bill of particulars] will be required even if the effect is disclosure of evidence or of theories."  *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks omitted).  "The length of the indictment is not dispositive if the defendant is still left with an insufficient understanding of the parameters of the scheme with which she is charged."  *United States v. Wang*, No. 23 Cr. 118-3 (AT), 2024 WL 1251105, at *3 (S.D.N.Y. Mar. 22, 2024).

---

[39] Pursuant to Fed. R. Crim. P. 7(f), a defendant "may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."  Dr. Terry respectfully requests permission to move outside of the 14-day window.  Because courts considering whether to direct the government to file a bill of particulars consider "not only the information provided in the indictment, but also discovery materials and other information provided to the defendant," *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 302 (S.D.N.Y. 2018), it was the better and more efficient course to move for this relief once discovery had been produced and reviewed.

[40] In accordance with Local Criminal Rule 16.1, defense counsel has conferred with the government about these requests in an effort the resolve the issues raised in this motion.  To date, the parties have been unable to resolve these issues by agreement.  Declaration of Nicholas J. Lewin ("Lewin Decl.") ¶ 2.

**B.    Dr. Terry Is Entitled to a Bill of Particulars**

As discussed in § I, *supra*, this Indictment is defective and must be dismissed.  Full stop.

A bill of particulars cannot cure all the Indictment's fatal deficiencies, but if the Court is not

inclined to dispose of the Indictment, Dr. Terry must be provided with particularity as to identify

the nature of the charges pending against her—something that the Indictment, despite its length,

fails to do.  Dr. Terry's requests are modest, but fundamental to her ability to defend this case:

She requests that the government identify: (1) the actions and related qualifying activities that

she allegedly undertook and that required registration under FARA, and (2) the individuals and

entities with whom she allegedly conspired.

1.    Request for Particulars as to Registrable Conduct

A bill of particulars is especially necessary in cases such as this where the government's

charges involve a broad and ill-defined statute, such as FARA.  *See Davidoff*, 845 F.2d at 1154–

55 (noting that when government brings charges "under statutes as broad as RICO," there is "an

obligation to particularize the nature of the charge to a degree that might not be necessary in the

prosecution of crimes of more limited scope").  Here, despite spanning roughly 10 years, the

Indictment fails to identify the conduct that gave rise to Dr. Terry's alleged obligation to register

under FARA.  Given the breadth of the statute under which Dr. Terry is being prosecuted and

lack of precision in the government's speaking Indictment, a bill of particulars is warranted.

This sort of request has been granted by other courts presiding over FARA cases.  For

example, in *United States v. Concord Management & Consulting LLC*, 385 F. Supp. 3d 69

(D.D.C. 2019), the defendant moved for a bill of particulars seeking more detailed information

about which alleged activities triggered a duty to register as a foreign agent under FARA, among

other particulars.  The court granted the motion, noting that while "[t]he indictment alleges that

the defendants agreed to a course of conduct that would violate . . . FARA's disclosure requirements . . . and provides specific examples of the kinds of expenditures and activities that required disclosure," the indictment was deficient because it neither "cite[d] the specific statutory and regulatory disclosure requirements that the defendants violated," nor did it "clearly identify which expenditures and activities violated which disclosure requirements." *Id.* at 78. Accordingly, the court ordered the government to "identify each *category* of activities that the government intends to establish triggered a duty to register as a foreign agent under FARA." *Id.* at 79. So too here the government must provide Dr. Terry with information identifying which activities violated which disclosure requirements.[41]

Glaring omissions from the Indictment tend to indicate that the government will seek to prove Dr. Terry had an obligation to register under FARA as the result of facts that are not alleged. In such circumstances, a bill of particulars is appropriate. *See, e.g.*, *Davidoff*, 845 F.2d at 1154 (reversing conviction and remanding for new trial where district court denied motion for bill of particulars and government confronted defendant at trial with evidence of "allegations not made prior to trial"). Specifically, while the Indictment alleges that Dr. Terry's registration obligation arose in 2013, it does not allege any facts that (even arguably) would require registration in that year. *See* Ind. ¶¶ 12, 62. Instead, the Indictment alleges that in 2013, Dr. Terry: (1) "repeatedly met and communicated" with an NIS official; (2) "arranged over email to have lunch" with an NIS official; (3) "asked [an NIS official] for 'thoughts/material'" for an upcoming speech she planned to deliver; and (4) was "picked up . . . in a vehicle with diplomatic

---

[41] The alleged overt acts are not helpful in this regard, as they are not limited to conduct that amounts to a substantive violation of the law. *See United States v. LaSpina*, 299 F.3d 165, 176 (2d Cir. 2002) ("An overt act . . . need not be itself a crime."). By the same token, "the Government is plainly not limited in its proof of overt acts at trial to those that are set forth in the Indictment" and the defense "cannot, therefore, limit their trial preparations to the set of . . . overt acts set forth in the Indictment." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) (granting motion for a bill of particulars).

plates registered to the ROK Mission to the United Nations." Ind. ¶ 12. The Indictment fails to allege that any of this conduct was undertaken at the "request" of the South Korean government, and in any event, none of this conduct is registrable conduct under FARA. *See* 22 U.S.C. § 611(c)(1)(i)–(iv). Dr. Terry is thus left to speculate as to what she could have done in 2013— more than a decade ago—that rendered her an agent under FARA.

Equally troubling, the Indictment alleges that Dr. Terry acted as an agent for "more than a decade," Ind. ¶ 1, but does not include allegations spanning "more than a decade," *see id.* ¶ 12 (alleging conduct from "mid-August 2013"), ¶ 51 (alleging conduct from "[o]n or about April 27, 2023").[42] Again, this indicates that at trial, the government will present activities from outside the Indictment and argue those activities created an obligation to register under FARA. Likewise, the Indictment does not include any allegations for broad swaths of time but alleges that Dr. Terry had an obligation to register for the entire period of 2013 through 2023. The absence of registrable conduct for these periods renders the Indictment defective, as explained in §§ I.F & G, *supra*. But in the alternative to dismissal, Dr. Terry must be informed of what conduct, if any, required her to register under FARA during the periods of June 2014 through December 2016, and December 2016 through December 2018.

Moreover, the Indictment fails to clarify which qualifying activities under 22 U.S.C. § 611(c)(1)(i)–(iv) apply. This omission prejudices Dr. Terry because undertaking a qualifying activity is a key element of the offense, and the definitions of those activities (*e.g.*, "political activities" and "political consult[ing]") present their own unique defenses. In the absence of any specificity, the defense and the Court are forced to speculate as to this key element, while the government maintains the flexibility to change its mind in the lead-up to trial. This approach to

---

[42] To be sure, neither of the activities cited in these paragraphs required registration. *See* § I.C, *supra*.

prosecution must not be countenanced.  *See Concord Mgmt.*, 385 F. Supp. 3d at 78 (directing government to identify "which disclosure provisions the defendants . . . allegedly violated").

### 2.    Requests to Identify Individuals

To prepare for trial, the government must identify Dr. Terry's alleged co-conspirators. As discussed in § I.G, *supra*, the single conspiracy count in the Indictment does not specify if it pertains to an alleged conspiracy with the South Korean NIS, the South Korean MFA, or with some other unidentified entity.  *See* Ind. ¶ 62.  To defend against the government's claim that Dr. Terry engaged in a decade-long conspiracy to violate FARA, the government must identify Dr. Terry's co-conspirators.  *See, e.g.*, *United States v. Bin Laden*, 92 F. Supp. 2d 225, 240–42 (S.D.N.Y. 2000) (directing government to identify unindicted co-conspirators).

*        *        *

The defense does not move to prematurely preview "the government's evidence and theories"; rather, it simply requires "enough information about the charge to prepare [a] defense."  *See Barnes*, 158 F.3d at 665.  To that end, our requests are minimal: (1) the government must identify Dr. Terry's alleged acts that required registration under FARA, and the related statutory qualifying activities, and (2) the government must identify Dr. Terry's alleged co-conspirators.

### III.    MOTION TO SUPPRESS DR. TERRY'S COERCED STATEMENTS

Prior to her arrest, Dr. Terry was subjected to a coercive, custodial interrogation, the statements from which are cited throughout the Indictment.  But notwithstanding the custodial nature of the interrogation, Dr. Terry was not advised of her rights in contravention of *Miranda v. Arizona*, 384 U.S. 436 (1966).  Accordingly, the statements Dr. Terry made during the interrogation must be suppressed.

A.       The FBI's Custodial Interrogation of Dr. Terry

At roughly 8:40 a.m. on June 5, 2023, three FBI Counterintelligence Division agents

approached Dr. Terry in her home that she shared with her partner.  Terry Decl. ¶¶ 2–3.  At this

time, Dr. Terry was alone in the apartment—shortly before the agents approached her, her

partner had left for the gym.  *Id.* ¶ 3.  Once in the apartment, the Supervisory Special Agent

("FBI SSA") took the lead; he communicated urgency and told Dr. Terry that he needed her help

to answer some questions.  *Id.* ¶¶ 3–4.  Dr. Terry—still in her pajamas and not wearing a bra—

asked if she could change, but the agents did not agree to allow her to get dressed and continued

to interrogate her.  *Id.* ¶ 4.

Dr. Terry then asked if she needed a lawyer.  *Id.* ¶ 6.  The FBI SSA ignored the question

and instead informed Dr. Terry that they were conducting a counterintelligence investigation and

needed her cooperation.  *Id.*  After roughly an hour of questioning at her apartment, the agents

were notified by other law enforcement personnel that Dr. Terry's partner was on his way home.

At this, the FBI SSA told Dr. Terry that she needed to come with them to a hotel so that they

could continue asking her questions.  *Id.* ¶ 9.  When Dr. Terry asked the FBI SSA what she

should say to her partner, the FBI SSA told her to say that the agents were investigating a matter

related to North Korea and needed her assistance.  *Id.*  It was at this point that Dr. Terry was

permitted to change, but not in private.  Instead, she was accompanied by the female agent who

watched her undress and put on undergarments and clothing.  *Id.* ¶ 11.

When Dr. Terry's partner returned home, two armed NYPD officers met him in the

apartment lobby and tried to prevent him from entering his own apartment.  *See id.* ¶ 10.  When

he entered the apartment, Dr. Terry told her partner that the FBI was there to investigate a matter

related to North Korea, as she had been instructed by the FBI SSA.  *Id.*  As Dr. Terry was led

- 40 -

away by the three FBI agents, with two NYPD officers nearby, her partner asked whether she needed help. *Id.* ¶ 12. Afraid, Dr. Terry felt she had to tell him she was fine. *Id.*

The FBI agents then escorted Dr. Terry out of her apartment building and to a hotel, surrounding her on all sides during the brief walk. *Id.* ¶ 13. Upon arriving at the hotel, Dr. Terry reminded the agents that she had a 10:00 a.m. Zoom meeting and asked if she could step outside to conduct the call. *Id.* ¶ 14. The agents said that she could not leave the room and had to conduct the Zoom meeting in front of them, which Dr. Terry did. *Id.* The agents then spent more than three hours interrogating and berating Dr. Terry in the hotel room. *Id.* ¶ 15. The FBI SSA repeatedly raised his voice with her and appeared visibly angry, speaking in a tone that suggested he believed she was lying. *See id.* ¶¶ 15–19. He accused Dr. Terry of working under the direction or control of NIS and told Dr. Terry that if she simply said what he needed to hear—that she was directed or controlled by NIS—the interrogation would end. *Id.* ¶¶ 15–18. The FBI SSA used threats and intimidation, telling Dr. Terry that her career would be in jeopardy if she did not agree with his characterizations of her contacts with South Korean officials. *Id.* ¶ 20; *see also id.* ¶ 28. At no point did the FBI agents tell her that she was free to leave the hotel room. *Id.* ¶¶ 14, 30.

After more than three straight hours of questioning in the hotel, the agents served Dr. Terry with search warrants for her apartment and cell phone. *Id.* ¶ 23. Dr. Terry again asked if she should call a lawyer, but again was not provided with an answer. *Id.* She asked if she could call her family to make sure they did not enter the apartment during the search. *Id.* ¶ 24. The agents permitted her to call her son and her partner, but required her to make the calls in front of the agents and on speakerphone. *Id.* The agents then escorted Dr. Terry back to her apartment, where they conducted a search. *Id.* ¶ 25. Throughout the encounter, Dr. Terry observed that

only one agent was taking sparse and intermittent notes, and at times, no notes at all. *Id.* ¶ 15.

She was never provided with a *Miranda* warning. *See id.* ¶ 30.

    **B.**    ***Miranda* Legal Standard**

    Before conducting a custodial interrogation—or "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his

freedom of action in any significant way"—law enforcement officials are required to advise a

suspect of his or her Fifth Amendment rights against self-incrimination. *Miranda*, 384 U.S. at

444. "The purpose of the *Miranda* warning is to ensure that the person in custody has sufficient

knowledge of his or her constitutional rights relating to the interrogation and that any waiver of

such rights is knowing, intelligent, and voluntary." *United States v. Carter*, 489 F.3d 528, 534

(2d Cir. 2007). Where a suspect is not properly warned of his or her rights, "the prosecution is

barred from using statements obtained during the interrogation to establish its case in chief."

*United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

    An individual is in custody when circumstances are such that "a reasonable person would

not have thought himself [or herself] free to leave" and "a reasonable person would have

understood his [or her] freedom of action to have been curtailed to a degree associated with

formal arrest." *Id.* at 672. In making this determination, courts in the Second Circuit assess

whether a reasonable person in the suspect's shoes would have understood that: (1) his or her

"detention was not likely to be 'temporary and brief'"; and (2) he or she "was 'completely at the

mercy of [law enforcement].'" *Id.* at 674–75 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 437–

38 (1984)). There is no bright line rule to determine when an individual is in custody. Instead, a

court must "[i]magin[e] oneself in the suspect's position," and weigh a range of factors,

including the interrogation's location, its length, the nature of the questions asked, and the force

of authority, including weapons, that the interrogating officers brought to bear on the accused. *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011). In short, "the court must assess whether the circumstances would tend to make an individual reasonably feel as though they were being questioned in a police-dominated setting." *United States v. Butt*, No. 18 Cr. 87 (NSR), 2019 WL 479117, at *12 (S.D.N.Y. Feb. 7, 2019) (citing *Newton*, 369 F.3d at 675).

### C.      Dr. Terry's Alleged Statements During the June 2023 Custodial Interrogation Must Be Suppressed

Throughout the interrogation, a reasonable person in Dr. Terry's position would not have felt "free to leave," and moreover, would have felt that her ordinary action had been "curtailed to the degree associated with formal arrest." *See Berkemer*, 468 U.S. at 440. The FBI SSA, accompanied by two other FBI agents, interrogated, berated, and yelled at Dr. Terry, first at her home—when she was not properly clothed, and where she was not permitted to move freely or be outside the agents' supervision—and in a hotel where she was closely monitored. In both locations, Dr. Terry was in custody.

In her apartment, the environment was quickly dominated by law enforcement and Dr. Terry was not permitted to move about freely. When the three FBI agents first arrived, Dr. Terry was in her pajamas and not wearing a bra, and was effectively denied the opportunity to change into something more appropriate. When she was finally given permission to change, she was forced to do so while being watched by an FBI agent. When her partner returned home, Dr. Terry observed that he was accompanied by armed NYPD officers, who then waited in the doorway where Dr. Terry could see them. Under these circumstances, Dr. Terry was in custody. *See United States v. Craighead*, 539 F.3d 1073, 1085 (9th Cir. 2008) ("Restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times."); *Butt*, 2019

WL 479117, at *15 (explaining that in a home setting, "[w]hen freedom of movement is

curtailed to the degree associated with a formal arrest . . . and an interrogation takes place,

*Miranda* warnings are mandatory").

Once she was brought to the hotel, it would have been clear to any reasonable person that

the encounter was not to be "temporary and brief."  *Newton*, 369 F.3d at 675–76; *see also United*

*States v. Tartaglione*, No. 16 Cr. 832 (KMK), 2023 WL 2237903, at *16–18 (S.D.N.Y. Feb. 27,

2023) (finding suspect was in custody when investigators "employed a ruse to compel

[d]efendant to leave his home and come out to the public road").  Further, Dr. Terry's actions

were even more restrained in this law enforcement-dominated setting than at her home.  *See Butt*,

2019 WL 479117, at *12.  While the officers did not physically restrain her, they repeatedly

threatened her job and professional future, implying that if she just told them enough, she would

be left alone.  As one court has noted, "[f]requently, the subtlest techniques can be the most

psychologically disarming."  *Id.* at *13.  In short, she was "completely at the mercy" of the FBI

agents.  *Newton*, 369 F.3d at 674–77.

Other factors, on balance, demonstrate that Dr. Terry was in custody throughout the day:

- Accounting for the time spent in both her apartment and the hotel suite, the interrogation lasted more than five hours—significantly longer than in other comparable cases.  *See, e.g.*, *United States v. Mittel-Carey*, 493 F.3d 36, 39–40 (1st Cir. 2007) (explaining "the length of the interrogation (ninety minutes to two hours)" weighs in favor of custody finding); *United States v. Carroll*, 102 F. Supp. 3d 1134, 1139 (N.D. Cal. 2015) ("[Defendant] was interrogated for nearly two hours.  Courts have found that this duration generally weighs toward a finding of custody.").

- The FBI agents never told her directly that she could leave the hotel and expressly told her she could not leave the room to conduct a work meeting via Zoom.  *See Butt*, 2019 WL 479117, at *16–17 (collecting cases and noting that whether "agents had *explicitly* told the defendant than he/she was not under arrest and was free to leave" weighs heavily on custody analysis (emphasis in original)).

- The lead agent raised his voice with her on numerous occasions, appeared to be visibly angry with her, and threatened her career.  *Cf. United States v. Familetti*,

878 F.3d 53, 61 (2d Cir. 2017) (holding suspect was not in custody where "agents engaged [the defendant] in a tone that was . . . non-confrontational"); *United States v. Faux*, 828 F.3d 130, 138–39 (2d Cir. 2016) (holding suspect was not in custody where "the tone of the questioning was largely conversational" and there was "no indication that the agents raised their voices . . . or made threats").

- The FBI agents clearly and intentionally cut Dr. Terry off from her family and prevented her from communicating freely. The agents separated Dr. Terry from her partner, insisting she travel with them to a hotel rather than question her in his presence. They instructed Dr. Terry to lie to her partner about the reason she was being taken away. At the hotel, they did not permit her to use her phone freely and required her to make all phone calls via speakerphone in their presence. These extreme measures to ensure Dr. Terry was within the agents' control demonstrate that she was in custody. *See Butt*, 2019 WL 479117, at *13; *see also Tartaglione*, 2023 WL 2237903, at *16 (finding suspect was in custody when investigators "acted to cut him off from communicating with others and control his movement by stepping between [d]efendant and his wife").

The tactics used by the FBI during the interrogation—tactics that were coercive and wildly disproportionate to the needs of the case—would have placed any reasonable person under the impression that her freedom was curtailed to the same degree as a formal arrest. In such circumstances, law enforcement agents are required to recite the warnings set forth in *Miranda*, importantly, of the right to remain silent and to have an attorney present. Dr. Terry was provided with no such warnings. Accordingly, the statements she made on June 5, 2023 must be suppressed.[43]

## IV.    MOTION TO SUPPRESS AND FOR DISCLOSURE OF FISA MATERIALS

On July 22, 2024, the government provided notice that pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), it intends to use or disclose information obtained or derived from electronic surveillance and physical searches conducted pursuant to FISA. ECF No. 11. This case presents

---

[43] To the extent that the Court requires additional information to rule on the instant motion, the defense respectfully requests that the Court schedule an evidentiary hearing to investigate further the government's conduct during the June 5, 2023 custodial interrogation. *See United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) ("[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.").

an atypical and troubling use of the secretive domestic intelligence collection and surveillance authorities. FISA was used to collect hundreds of communications by a U.S. citizen on U.S. soil, years into a criminal investigation that culminated in a charge of failing to file a document with the Department of Justice. While the defense has very little information regarding this extremely aggressive use of FISA (by design), what has been produced is alarming. For the reasons that follow, Dr. Terry respectfully requests that the Court scrutinize the FISA applications and materials, suppress any evidence and fruits that were obtained unlawfully, and order disclosure of the FISA materials to the defense.

### A.    FISA Legal Standard

"Enacted in 1978, FISA permits the Chief Justice of the United States to designate eleven federal judges as the Foreign Intelligence Surveillance Court ('FISC'), with jurisdiction to entertain *ex parte* executive applications for electronic surveillance 'for the purpose of obtaining foreign intelligence information.'" *United States v. Abu Jihaad*, 630 F.3d 102, 117 (2d Cir. 2010) (quoting 50 U.S.C. §§ 1802(b), 1803(a)(1)). To obtain an order to surveil a U.S. citizen under FISA, the government must provide probable cause to believe, *inter alia*, that the target of the electronic surveillance or physical search is "an agent of a foreign power" and that the facilities or places at which the surveillance or search is directed are being used or are about to be used by the target. 50 U.S.C. §§ 1804(a)(3), 1805(a)(2), 1823(a)(3), 1824(a)(2).

The phrase "agent of a foreign power" is more limited under FISA than under FARA. FISA defines "agent of a foreign power" to include any person who is involved in "clandestine intelligence activities for or on behalf of a foreign power,"[44] sabotage, or international terrorism.

---

[44] FISA does not define "clandestine intelligence gathering activities." The legislative history makes clear, however, "that the drafters viewed these 'activities' in light of the criminal espionage laws, including 18 U.S.C. §§ 793 and 794, and considered that such 'activities' would include, for example, 'collection or transmission of information or

*Id.* § 1801(b)(2).  In making this probable cause determination, FISA directs that "no United States person may be considered . . . an agent of a foreign power solely upon the basis of activities protected by the [F]irst [A]mendment" to the U.S. Constitution.  *Id.* § 1805(a)(2)(A). An order authorizing FISA surveillance must specify the identity of the surveillance target; the location of each of the facilities or places at which the surveillance will be directed; the type of information sought and communications or activities to be subjected to the surveillance; the means by which the surveillance will be effected; the period of time for which the surveillance is approved; and the minimization procedures to be employed.  *Id.* §§ 1805(c), 1824(c).

Where "information was unlawfully acquired" or "surveillance was not made in conformity with an order of authorization or approval," FISA provides a suppression remedy. *Id.* §§ 1806(e), 1825(f).  On a defense motion, and where the Attorney General avers that an adversary hearing would be untenable, a court must conduct an *in camera* and *ex parte* review of "the application, order, and such other materials relating to the surveillance as may be necessary to determine" whether surveillance was lawful.  *Id.* §§ 1806(f), 1825(g).  If the court determines that surveillance was unlawful, any evidence that was unlawfully obtained or derived must be suppressed.  *Id.* §§ 1806(g), 1825(h).

The Court has discretion to disclose FISA materials to the defense "where such disclosure is necessary to make an accurate determination of the legality of the surveillance."  *Id.* §§ 1806(f), 1825(g).[45]  "Such a need might arise if the judge's initial review revealed potential

---

material that is not generally available to the public.'"  *United States v. Rosen*, 447 F. Supp. 2d 538, 547 (E.D. Va. 2006) (quoting S. Rep. No. 95–701, at 21–22 (1978), 1978 U.S.C.C.A.N. 3973, 3990–91).  Further, the drafters anticipated that "most of the persons under surveillance under this subparagraph will be violating the criminal espionage laws."  *Id.* at n.12 (quoting S. Rep. No. 95–701, at 21).

[45] *See also* David S. Kris & J. Douglas Wilson, *National Security Investigations and Prosecutions* [hereinafter "Kris Treatise"] § 31:2 (2024) (stating that these provisions "permit the court to order disclosure if it finds that it cannot determine the lawfulness of the FISA activity without the assistance of defense counsel and an adversary presentation").

irregularities such as 'possible misrepresentation of fact . . . or surveillance records which include[ ] a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.'" *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (quoting S. Rep. 95-604, at 58).  Moreover, even if the Court determines that surveillance was lawful, FISA provides for disclosure of materials "to the extent that due process requires," including materials that are discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  *See* 50 U.S.C. §§ 1806(g), 1825(h).[46]

### B.    The Court Should Closely Scrutinize the FISA Applications and Materials and Suppress Any Evidence Obtained or Derived Unlawfully

Given that the defense has not been afforded an opportunity to review the operative FISA applications, orders, and related materials, we cannot meaningfully assess whether the electronic surveillance or physical searches conducted here were lawful and completed in conformity with the requirements set forth in FISA.  Thus, Dr. Terry respectfully requests that the Court review such materials *in camera* and *ex parte*, and suppress all evidence which it determines to have been unlawfully obtained or derived from the FISA activity conducted here.

This case presents an unusual and troubling use of FISA authorities.  The government used FISA to collect Dr. Terry's communications years after she had become the subject of a criminal investigation.  Lewin Decl. ¶ 5.  Although the government was required to certify that "a significant purpose of the surveillance is to obtain foreign intelligence information," 50 U.S.C. § 1804(a)(6)(B), given the timing of FISA surveillance and the advance stage of the government's investigation at that point, it strains credulity that obtaining "foreign intelligence information" was the purpose of this collection.  The government should have used Title III

---

[46] *See also* Kris Treatise § 31:4 (explaining that "FISA's legislative history confirms that Congress intended the discovery provisions of the statute to be 'wholly consistent' with *Brady*").

authorities to obtain a search warrant, which would have enabled the defense to scrutinize the underlying applications and materials. Instead, the government chose to apply for a warrant under FISA, all but guaranteeing that the underlying applications and materials would never be subjected to the adversarial system. In these circumstances, the Court must not permit the government's extreme and unwarranted surveillance tactics to evade scrutiny.

It is also likely that the underlying applications contain false representations and omissions, rendering the FISC's probable cause determinations defective.[47] Although FISA prohibits a probable cause determination to be based on "activities protected by the [F]irst [A]mendment," 50 U.S.C. § 1805(a)(2), based on the allegations in the Indictment, discussed in greater detail in § I.C, *supra*, the defense has serious concerns that the government relied on Dr. Terry's protected conduct in its applications to the FISC. For example, an August 2023 search warrant that was produced in discovery and issued around the same period of the government's FISA surveillance references Dr. Terry engaging in fact gathering from a South Korean MFA source, and then incorporating some of those facts into her journalistic work. *See* Lewin Decl. ¶ 3. At a minimum, the FISA applications likely omitted necessary context that would have made apparent to the FISC that these activities amounted to protected conduct. Furthermore, based on representations that were made in search warrant applications sought concurrently with FISA coverage, the defense has reason to believe that the government included false information in its applications. The same August 2023 search warrant affidavit cites a false report from an unreliable human source that Dr. Terry was "being paid by the South Korean government to write a recent magazine article." *Id.* ¶ 4. This is a false allegation that the government repeated

---

[47] While the defense acknowledges that "it is virtually impossible for a FISA defendant to make the showing that *Franks* requires in order to convene an evidentiary hearing," *United States v. Daoud*, 755 F.3d 479, 496 (7th Cir. 2014), we would welcome such a hearing if helpful to the Court.

in the Indictment.  *See* Ind. ¶ 13; *see also supra*, note 9.  The government had means of verifying

that information, but instead, included this false statement in search warrant application, and

likely included the same false statement in its FISA applications.

      We suspect that subjected to scrutiny, it will be apparent that FISA coverage in this case

was unlawful and accordingly, all evidence and fruit of that coverage must be suppressed.

      C.    **The Court Should Disclose FISA Materials to the Defense, to the Extent the Court Deems Appropriate**

      Finally, to the extent appropriate, the Court should disclose the FISA applications to the

defense.  The defense acknowledges that "disclosure of FISA materials [to the defense] is the

exception and *ex parte, in camera* determination is the rule."  *Abu Jihaad*, 630 F.3d at 129.

Nevertheless, to the extent that the Court identifies irregularities such as "possible

misrepresentations of fact" in the government's applications or "a significant amount of

nonforeign intelligence information" in the FISA materials, an adversary proceeding to

determine legality may be necessary and disclosure should be made.  *See* 50 U.S.C. §§ 1806(f),

1825(g); *Duggan*, 743 F.2d at 78.  Further, the Court should disclose all materials that are

discoverable under *Brady*.  *See* 50 U.S.C. §§ 1806(g), 1825(h).

### CONCLUSION

      This is a case that should never have been brought; for the reasons stated herein, the

Indictment must be dismissed.  Alternatively, if the Court allows this case to proceed, Dr. Terry

respectfully requests: (1) the government provide a bill of particulars; (2) the Court suppress

statements made by Dr. Terry during the June 5, 2023 custodial interrogation; and (3) the Court

scrutinize the FISA materials and suppress any evidence and/or fruits that were obtained

unlawfully, and disclose the FISA materials to the defense to the extent the Court deems

appropriate and/or as due process requires.

Dated:   New York, New York          Respectfully submitted,
         February 26, 2025

By: _____
    Nicholas J. Lewin

    KRIEGER LEWIN LLP
    350 Fifth Avenue, 77th Floor
    New York, NY  10118
    Telephone: (212) 390-9550
    Nick.Lewin@kriegerlewin.com
    Melissa.Danzo@kriegerlewin.com

    SELENDY GAY PLLC
    1290 Avenue of the Americas
    New York, NY  10104
    Telephone: (212) 390-9000
    FGay@selendygay.com
    TAgangaWilliams@selendygay.com
    JBean@selendygay.com

    WILLKIE FARR & GALLAGHER LLP
    787 Seventh Avenue
    New York, NY  10019-6099
    Telephone: (212) 728-8000
    lwolosky@willkie.com

    JENNER & BLOCK LLP
    1155 Avenue of the Americas
    New York, NY  10036-2711
    Telephone: (212) 891-1600
    abarkow@jenner.com
    abernstein@jenner.com
    jgordon@jenner.com

    *Attorneys for Dr. Sue Mi Terry*