**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

     v.

SUE MI TERRY,

        Defendant.

No. 1:24-cr-00427-LGS

---

### BRIEF OF *AMICI CURIAE* KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY AND AMERICAN CIVIL LIBERTIES UNION IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Aamra Ahmad*
American Civil Liberties Union Foundation
915 15th Street NW
Washington, DC 20005
Phone: (202) 457-0800
aahmad@aclu.org

Patrick Toomey
Hina Shamsi
Scarlet Kim
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 519-7816
ptoomey@aclu.org

Xiangnong Wang
Mary "Allie" Schiele**
Katie Fallow
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
george.wang@knightcolumbia.org

*Counsel for the Amici Curiae*

*Admission *pro hac vice* pending
**SDNY admission pending

**Corporate Disclosure Statement**

Pursuant to Local Criminal Rule 12.4 and Federal Rule of Criminal Procedure 12.4, amici curiae the Knight First Amendment Institute at Columbia University and the American Civil Liberties Union have no parent corporations and no publicly held corporation owns 10 percent or more of their stock.

/s/ Xiangnong Wang
Xiangnong Wang

*Counsel for Amici Curiae*

i

## Table of Contents

Table of Authorities ..................................................................................................... iii

Interest of Amici Curiae.................................................................................................1

Introduction and Summary of Argument.......................................................................1

I.     Construing FARA broadly would raise serious First Amendment concerns because it would impose onerous disclosure and reporting obligations on a wide range of individuals and organizations engaged in constitutionally protected activity.............................................................................................3

        A.     FARA's terms could be read to reach a wide range of individuals and organizations engaged in constitutionally protected expression.......................3

        B.     Construing FARA broadly would raise serious First Amendment questions. ........................................................................................6

               1.     FARA imposes onerous disclosure and reporting obligations, backed by criminal penalties, that burden protected speech................6

               2.     Construing FARA broadly would also invite discriminatory enforcement of the statute, as evidenced by the government's history of using the law to target disfavored viewpoints. ...................10

II.    To avoid serious First Amendment questions, the Court should construe FARA narrowly. ............................................................................................14

Conclusion ...................................................................................................................16

Certificate of Service ...................................................................................................18

## Table of Authorities

**Cases**

*ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) .............................................................. 1

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234 (2002) .......................................................... 10

*Att'y Gen. of the U.S. v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159 (2d Cir. 1982) ........................................................................................................... 4, 15

*Boos v. Barry*, 485 U.S. 312 (1988) ............................................................................... 14

*Cheek v. United States*, 498 U.S. 192 (1991) .................................................................. 15

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ...................................... 11

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) .............................................................. 10, 11

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) ......................................................... 11

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) ....................................................... 1

*Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) .......................................................... 1, 8

*Meese v. Keene*, 481 U.S. 465 (1987) .......................................................................... 1, 9

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) .................................................. 9

*Reno v. ACLU*, 521 U.S. 844 (1997) ........................................................................ 10, 11

*Smith v. Goguen*, 415 U.S. 566 (1974) ......................................................................... 15

*TikTok v. Garland*, 145 S. Ct. 57 (2025) ........................................................................ 1

*United States v. Starnes*, 583 F.3d 196 (3d Cir. 2009) ...................................................... 15

**Statutes**

22 U.S.C. § 611 ....................................................................................................... 3, 4, 5, 6

22 U.S.C. § 612 .......................................................................................................... 6, 7

22 U.S.C. § 613 ............................................................................................................. 6

22 U.S.C. § 614 ............................................................................................................. 8

22 U.S.C. § 616 ............................................................................................... 7

22 U.S.C. § 618 ............................................................................................... 9

**Other Authorities**

28 C.F.R. § 5.304 ............................................................................................. 6

ABA Task Force on the Foreign Agents Registration Act, Report, *FARA: Issues
& Recommendations for Reform* (July 16, 2021), https://perma.cc/US9Q-
BGN3 ........................................................................................................... 8

Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed.
Reg. 40 (Jan. 2, 2025) ................................................................................. 4

Andrew Lanham, *When W.E.B. Du Bois Was 'Un-American'*, Bos. Rev. (Jan. 13,
2017), https://perma.cc/2NKQ-Z7UH ...................................................... 12

Carol Glatz, *Pope to U.S.: Migration Policies Built of Force, Not Truth, 'Will End
Badly,'* U.S. Conference of Catholic Bishops (Feb. 11, 2025),
https://perma.cc/T5KM-L5LD ................................................................... 4

Charlie Campbell, *'We Want to Help the World Better Understand China.' Meet
Chen Xiaoqing, the Film Director Using Food to Make Friends*, Time (Oct. 6,
2020), https://perma.cc/3ZBK-V2WL ....................................................... 5

Collin P. Poirot & Azadeh Shahshahani, *The DOJ is Using "Foreign Agents"
Accusations to Repress Black Liberation Organizers*, The Nation (Apr. 25,
2023), https://perma.cc/FW8M-MFT3 ...................................................... 5

Dan Friedman, *The Trump Administration Orders an Al Jazeera Affiliate to
Register as a Foreign Agent*, Mother Jones (Sept. 15, 2020),
https://perma.cc/B94A-FQGL .................................................................. 13

Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the Chilling
Effect*, 58 B.U. L. Rev. 685 (1978) ......................................................... 10

*General Policy Regarding Charging, Plea Negotiations, and Sentencing*, Office
of the Att'y Gen. (Feb. 5, 2025), https://perma.cc/LBH9-N949 ............... 13

Iskra Kirova, *Foreign Agent Laws in the Authoritarian Playbook*, Human Rights
Watch (Sept. 19, 2024), https://perma.cc/P8WR-APGD .......................... 14

Josh Gerstein, *Lawmakers Push for Al Jazeera to Register as Foreign Agent*,
Politico (Mar. 5, 2018), https://perma.cc/FAS2-6ZTH ............................ 13

Joshua R. Fattal, *The Justice Department's New, Unprecedented Use of the Foreign Agents Registration Act*, Lawfare (Dec. 18, 2019), https://perma.cc/8KL7-JQ2B ............................................................... 12

Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Abigail Dillen, President, Earthjustice (Oct. 1, 2018), https://perma.cc/DN9S-PJ8U ................................... 12

Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Andrew Steer, President & CEO, World Res. Inst. (Sept. 5, 2018), https://perma.cc/8XFZ-URMP ....................................................................................................... 12

Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Kierán Suckling, Exec. Dir., Ctr. for Biological Diversity, Inc. (June 20, 2018), https://perma.cc/4HD5-8NL3 ............................................................... 12

Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Rhea Suh, President, Nat. Res. Def. Council (June 5, 2018), https://perma.cc/FP99-3VXD ............................................................................................. 12, 13, 16

Marc Tracy & Lara Jakes, *U.S. Orders Al Jazeera Affiliate to Register as Foreign Agent*, N.Y. Times (Sept. 15, 2020), https://perma.cc/5V2R-ZD9S ..................................... 13

Nick Robinson, *"Foreign Agents" in an Interconnected World: FARA and the Weaponization of Transparency*, 69 DUKE L. J. 1075 (2020)...................................... 5, 11, 16

Pablo Gorondi, *Hungary Rejects US Criticism of Law on Foreign-Funded NGOs*, Associated Press (June 20, 2017), https://perma.cc/UH23-PKXX......................................... 14

Press Release, *Sen. Cruz and Colleagues Urge Department of Justice to Investigate Qatar's Al Jazeera Network*, Sen. Ted Cruz (Mar. 6, 2018), https://perma.cc/T2T5-2G3E ............................................................... 13

Restatement (Third) Of Agency § 1.01 (2006)............................................................. 4

U.S. DOJ, National Security Division, Frequently Asked Questions, https://perma.cc/4W52-4NTN ....................................................................... 8

**Interest of Amici Curiae**

The Knight First Amendment Institute at Columbia University is a nonpartisan, nonprofit organization that defends the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute promotes a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws. The ACLU has frequently appeared in First Amendment cases in this Court and courts around the country, both as direct counsel and as amici curiae, including in cases concerning the misuse of national security authorities to suppress, burden, or penalize First-Amendment protected conduct. *See*, *e.g.*, *TikTok v. Garland*, 145 S. Ct. 57 (2025) (amicus); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (amicus); *ACLU v. Clapper*, 785 F.3d 787 (2d Cir. 2015) (counsel); *Meese v. Keene*, 481 U.S. 465 (1987) (amicus); *Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965) (amicus).[1]

**Introduction and Summary of Argument**

Enacted as an effort to counter Nazi propaganda during World War II, the Foreign Agent Registration Act ("FARA") requires any "agent" of a "foreign principal" that is engaged in covered activities, including expressive activities, to register with the government as a foreign agent, to disclose extensive information about their associations and activities, and to append a label to

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

informational materials they distribute stating that they are acting on behalf of a foreign principal. Willful violations of the law can lead to criminal penalties, including steep fines and up to five years in prison.

Applying FARA's registration and disclosure requirements to actors and activities that are the core target of FARA—for example, to an individual who is covertly engaged in lobbying on behalf of a foreign state—likely presents no First Amendment problem. But FARA's operative terms are broad and vague, as this case illustrates. The statute can be read to apply to all manner of organizations and individuals—including media organizations, journalists, and nonprofits—that are somehow connected to foreign individuals or entities. The law designates as "agents" entities that merely act at the "request" of "foreign principals" and it defines "foreign principal" to include not just foreign governments but practically any foreign person or organization. And its definition of "political activities" encompasses any and all attempts to influence U.S. public opinion on domestic or foreign policy. The breadth and vagueness of FARA's terms, combined with its onerous registration and labeling obligations and criminal enforcement penalties, make the law susceptible to expansive interpretations that impose significant burdens on First Amendment protected activity without furthering any legitimate government interest. The Court should be especially attuned to these risks because the history of FARA's enforcement demonstrates that the statute's vague and broad terms can be weaponized to target disfavored speech.

Interpreting FARA's terms broadly would raise serious First Amendment questions because it would burden and chill a broad range of protected speech. Given the significant constitutional concerns that might otherwise arise, the Court should construe the statute more narrowly. Although the government certainly has a legitimate interest in making sure that Americans are informed about attempts by foreign governments to influence domestic public

discourse, reading FARA expansively—as the prosecution does in the indictment against Dr. Terry—will unjustifiably endanger protected advocacy and association that lie at the core of the First Amendment. Accordingly, the Court should adopt Dr. Terry's proposed narrowing constructions of the statute.

I.    **Construing FARA broadly would raise serious First Amendment concerns because it would impose onerous disclosure and reporting obligations on a wide range of individuals and organizations engaged in constitutionally protected activity.**

A.    **FARA's terms could be read to reach a wide range of individuals and organizations engaged in constitutionally protected expression.**

On its face, FARA is remarkably expansive. The law applies to any "agent of a foreign principal" that engages in any of a broad set of covered activities, subject to only limited exceptions. 22 U.S.C. § 611. As explained below, FARA includes a number of provisions that, interpreted broadly, could sweep in a wide range of individuals and organizations engaged in constitutionally protected speech.

First, FARA's definition of "foreign principal" extends not just to foreign governments, political parties, and commercial enterprises, but to virtually any foreign person or organization. *See* 22 U.S.C. § 611(b). The law makes no distinction between an "agent" who acts as a mouthpiece of a foreign adversary and one who works with a corporation like the French social media platform BeReal, or a nonprofit like the Geneva-based Médecins Sans Frontières, or a media organization like the British newspaper *The Guardian*.

Second, FARA's definition of agency is far more expansive than common law and colloquial understandings of the term. An individual or organization must register as an "agent" if they act "at the order, request, or under the direction or control" of a foreign principal. 22 U.S.C. § 611(c)(1). Merely acting at the "request" of a foreign principal, therefore, triggers obligations under the statute. Although FARA does not define "request," the conception of agency in the

3

statute can be read to be far more capacious than under the common law, which requires some form of "control" by the principal over the agent and consent by the parties.[2] *See Att'y Gen. of the U.S. v. Irish N. Aid Comm.* ("*INAC*"), 668 F.2d 159, 161 (2d Cir. 1982) ("The exact perimeters of a 'request' under the Act are difficult to locate, falling somewhere between a command and a plea."); Amending and Clarifying Foreign Agents Registration Act Regulations, 90 Fed. Reg. 40, 42 (Jan. 2, 2025) (rulemaking notice indicating that the Department of Justice declines to adopt the common law definition of agency).

A broad understanding of "request" could conceivably cover countless relationships and interactions between U.S.-based speakers and foreign individuals and entities. For instance, a U.S. environmental nonprofit might be forced to register as an "agent" if a Canadian counterpart encouraged it to host a public event about climate change. A priest at an American church could be considered an "agent" if, spurred by an address by the Pope, they delivered a sermon about American immigration policy.[3] If "request" is construed broadly, any number of innocuous actions could create agency relationships under FARA, despite having little relation to the statute's goals.

Third, FARA implicates a wide set of expressive activities. For example, it applies to individuals and organizations that engage in "political activities for or in the interests of [a] foreign principal," or that act as a "publicity agent" for a foreign principal. 22 U.S.C. § 611(c)(1)(i)–(ii). The statute's definition of "political activities" includes any attempt to "influence . . . any section of the public within the United States with reference to formulating, adopting, or changing the

---

[2] The Restatement (Third) of Agency defines the agent–principal relationship in this way: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006).

[3] *See* Carol Glatz, *Pope to U.S.: Migration Policies Built of Force, Not Truth, 'Will End Badly,'* U.S. Conference of Catholic Bishops (Feb. 11, 2025), https://perma.cc/T5KM-L5LD.

domestic or foreign policies of the United States" or "with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party." 22 U.S.C. § 611(o). This definition seems to encompass not just lobbying efforts aimed at U.S. officials, but also almost any effort to influence U.S. public opinion about foreign or domestic policy. It also seems to encompass many journalistic activities, including news reporting, since most journalism is intended to "influence" U.S. public discourse. Reading the statute broadly, an American freelance writer might be required to register under FARA simply for publishing a news article solicited by, say, *The Economist* (which is owned by a British company).

FARA's definition of "publicity agent" is similarly broad. A "publicity agent" includes "any person who [for or in the interests of a foreign principal] engages directly or indirectly in the publication or dissemination of oral, visual, graphic, written, or pictorial information or matter of any kind." 22 U.S.C. § 611(h). Understood broadly, this definition would require Netflix to register under FARA for distributing a documentary series that celebrates Chinese cuisine and culture, so long as it was "for or in the interests of" China;[4] and it could justify the prosecution of a civil rights activist for circulating a pamphlet expressing antiwar views "for or in the interests of" a foreign advocacy group, even if the pamphlets reflected the activist's own beliefs.[5]

---

[4] *See* Charlie Campbell, *'We Want to Help the World Better Understand China.' Meet Chen Xiaoqing, the Film Director Using Food to Make Friends*, Time (Oct. 6, 2020), https://perma.cc/3ZBK-V2WL.

[5] *See* Nick Robinson, *"Foreign Agents" in an Interconnected World: FARA and the Weaponization of Transparency*, 69 DUKE L. J. 1075, 1118–20 (2020) (discussing the prosecution of W.E.B. Du Bois under FARA for distributing antiwar literature that espoused similar views as that of a foreign organization); Collin P. Poirot & Azadeh Shahshahani, *The DOJ is Using "Foreign Agents" Accusations to Repress Black Liberation Organizers*, The Nation (Apr. 25, 2023), https://perma.cc/FW8M-MFT3 (discussing the FARA prosecutions of several Black liberation organizers for, among other things, speaking in favor of a foreign country).

Although FARA includes some limited exemptions, they do little to narrow or even clarify the statute's scope. 22 U.S.C. § 613. For example, the statute exempts "bona fide religious, scholastic, academic, or scientific pursuits or of the fine arts," 22 U.S.C. § 613(e), but the Department of Justice ("DOJ") has stated that this exemption does not apply to persons engaged in "political activities." *See* 28 C.F.R. § 5.304(d). And while FARA exempts certain entities engaged in "bona fide news or journalistic activities," the provision narrowly applies to media organizations that are 80% beneficially owned by U.S. citizens, have only U.S. officers or directors, and are not directed, financed, or subsidized by a foreign principal. 22 U.S.C. § 611(d). Many respected media organizations are not covered by this carve-out—organizations including the British Broadcasting Company (established by royal charter by the government of the United Kingdom) and *Politico* (owned by the Germany-based Axel Springer SE).

### B. Construing FARA broadly would raise serious First Amendment questions.

#### 1. FARA imposes onerous disclosure and reporting obligations, backed by criminal penalties, that burden protected speech.

FARA requires entities within its broad sweep to comply with onerous requirements that can significantly burden their expressive activities. These concerns are especially pronounced if FARA's provisions are interpreted expansively to reach the expressive activities of media organizations, journalists, and nonprofits.

The statute requires covered entities to register with the Attorney General and disclose detailed information about their business, associations, and expressive activities. *See* 22 U.S.C. § 612(a). To comply with the law, a registrant must submit a "true and complete" statement that includes, among other things: the registrant's name and address; her nationality; an accounting of any actions she has taken as "an agent of a foreign principal," including all "political activity"; the

"nature and amount" of any contributions from a foreign principal; any agreements with a foreign principal; and all "[s]uch other statements, information, or documents pertinent to the purposes" of FARA, as determined by the Attorney General. *Id.* § 612(a)(1)–(10). FARA requires that this detailed information be made available for "public examination and inspection," and through a publicly accessible database. 22 U.S.C. § 616(a), (d). Registration statements are also transmitted to the Department of State for any "use as the Secretary of State may determine to be appropriate from the point of view of the foreign relations of the United States," and may be made available to administrative agencies and committees of Congress as relevant to the purposes of the statute. *Id.* § 616(b), (c).

If the statute were interpreted broadly, FARA's registration burdens would fall especially heavily on media organizations, journalists, and nonprofits. FARA can impose serious burdens on newsgathering by requiring journalists and media organizations to disclose information about sensitive sources. For instance, a journalist who speaks with a foreign political dissident and then publishes an article echoing their views could be considered a "publicity agent" for the dissident, requiring the journalist to disclose the dissident's name and address. *See* 22 U.S.C. § 612(a)(3) (requiring disclosure of "the name and address of every foreign principal for whom the registrant is acting"). Many media organizations would likely rather forgo speaking to or working with foreign sources at all than comply with these mandates. Similarly, U.S. nonprofits may limit their interactions and relationships with foreign entities out of a concern that their activities might require registration under FARA. Given these requirements, civil society groups may stop engaging in otherwise constitutionally protected activities rather than take on the risks associated with FARA.

In addition to registration, FARA requires registrants to append a stigmatizing label to expressive materials. The law prohibits covered entities from transmitting "informational materials for or in the interests of [a] foreign principal" unless registrants attach to the materials "a conspicuous statement that the materials are distributed by the agent on behalf of the foreign principal." 22 U.S.C. § 614(b). The DOJ has determined that all informational materials disseminated by registrants "regardless of means of dissemination" must be labeled, including posts on social media and other digital communications.[6] Registrants must file copies of all such materials with the DOJ within 48 hours of distribution. *Id.* § 614(a).

These onerous requirements would likely have a profound chilling effect on the speech of entities subject to FARA's obligations, raising serious First Amendment concerns, if FARA were construed broadly. Merely requiring an individual or organization to self-identify as a "foreign agent" can burden their First Amendment rights. *Cf. Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965) (holding that law requiring individuals who wanted to receive "communist political propaganda" to notify the post office in advance was "almost certain to have a deterrent effect" on the addressee's exercise of their First Amendment rights because addressees were "likely to feel some inhibition in sending for literature which federal officials have condemned as 'communist political propaganda'"). Registration under FARA comes with obvious reputational implications; registrants may be perceived as less trustworthy, or biased, or even in some sense disloyal.[7] The label also undercuts a registrant's speech by implying that the so-called "agent" is not acting of

---

[6] *See* U.S. DOJ, National Security Division, Frequently Asked Questions, https://perma.cc/4W52-4NTN.

[7] *See* ABA Task Force on the Foreign Agents Registration Act, Report, *FARA: Issues & Recommendations for Reform*, at 5 (July 16, 2021), https://perma.cc/US9Q-BGN3 (noting that "the 'agent' label unduly stigmatizes FARA registration because the word 'agent' is regularly associated colloquially with covert government-sponsored espionage activities.").

their own accord. Faced with the serious costs of registering as a foreign agent based on activities that are "arguably within the reach of" FARA, organizations and individuals "might well conclude that the safe course is to avoid controversy" and cease engaging in those activities altogether. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 257 (1974).[8]

Beyond the chilling effect of such a disclosure, the law's labeling requirement frequently compels "agents" to mischaracterize their relationship with the relevant foreign principal. Registrants must state that they are distributing expressive materials "on behalf of" a foreign principal, even though the agency relationship contemplated by FARA is far more expansive than that statement implies. Moreover, given the statute's breadth and its harsh penalties for failure to register (as discussed below), individuals and organizations may feel compelled to register under FARA out of an abundance of caution, even when they are not in fact acting at the request of a foreign principal, and thus would be required to misleadingly label their speech. FARA in effect requires covered entities to publicly confess that they are speaking at the behest of a foreign entity even if they are not.

FARA's burdens on protected speech are exacerbated by its criminal penalties. Any person who "willfully violates" FARA may face up to five years in prison and steep financial penalties. 22 U.S.C. § 618(a). The serious penalties that attach to FARA violations, and the collateral consequences of prosecution or conviction, are likely to chill a wide range of speakers from engaging in activities that could be understood to be covered by the statute. *See Reno v. ACLU,*

---

[8] These are concerns not addressed in *Meese v. Keene*, where the Court upheld a former provision in FARA that required materials covered by the law to be classified as "political propaganda," reasoning that the term was "neutral" and not "pejorative." 481 U.S. 465, 483 (1987). The Court was clear, however, that it was not opining on the constitutionality of the registration and disclosure provisions not at issue in the case, including "the validity of the characteristics used to define the regulated category of expressive materials." *Id.* at 467.

521 U.S. 844, 872 (1997) (explaining that the "severity of criminal sanctions" along with "the opprobrium and stigma of a criminal conviction" may lead "speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images"); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) (explaining that "few legitimate [speakers] would risk distributing [speech] in or near the uncertain reach of [a] law" imposing severe criminal penalties); *see also* Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the Chilling Effect*, 58 B.U. L. Rev. 685, 697 (1978) ("The possibility of imprisonment coupled with the stigma and disabilities which accompany a criminal conviction will more often lead an individual to view the criminal penalty as more harmful than a civil sanction."). This is true even if the registrant believes that the criminal prosecution would likely be unsuccessful. *See Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965) ("Even the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression."). Finally, criminal prosecution under FARA poses especially stark risks to free speech because the law could be interpreted to not require specific knowledge of a duty to register. Such a reading would exacerbate FARA's chilling effects by making even innocent and unknowing expressive activity punishable by criminal sanctions. *See* Def. Br. at 21–25.

> ## 2. Construing FARA broadly would also invite discriminatory enforcement of the statute, as evidenced by the government's history of using the law to target disfavored viewpoints.

Given FARA's breadth, a wide range of entities could potentially be characterized as "foreign agents," leaving significant enforcement discretion in the hands of government prosecutors. Absent a narrowing construction, FARA is susceptible to selective and discriminatory enforcement.

The Supreme Court has long recognized that laws creating an unacceptable danger for viewpoint-discriminatory enforcement raise serious First Amendment problems. *See, e.g.*, *Reno*, 521 U.S. at 849, 872 (holding that vagueness and overbreadth of federal law restricting sexually explicit content created both an "obvious chilling effect on free speech" as well as a "risk of discriminatory enforcement"); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (noting that "[t]he prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement"); *Dombrowski*, 380 U.S. at 494 ("So long as [an overly broad] statute remains available to the State the threat of prosecutions of protected expression is a real and substantial one."); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763–64 (1988) (emphasizing, in case involving a speech licensing law, that absent "standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker").

Indeed, FARA's history shows how easily the law's breadth can be used to stifle disfavored viewpoints. During the McCarthy era, the government infamously prosecuted noted civil rights leader W.E.B. Du Bois for his failure to register as a foreign agent after he distributed antinuclear literature originating from a French nonprofit.[9] The government accused Du Bois of acting as a "publicity agent" for the nonprofit by distributing the literature,[10] and viewed his advocacy as "communist propaganda meant to encourage American pacifism in the face of Soviet

---

[9] *See* Robinson, *supra*, at 1118–20.

[10] *Id.* at 1119–20.

aggression."[11] Although Du Bois was ultimately acquitted, the costs of his criminal prosecution were significant and the stigma of being labeled a foreign agent followed him for years.[12]

While FARA prosecutions were rare in the years following the Cold War, the last decade has seen a concerning uptick in the use of FARA by government actors to stigmatize and suppress disfavored content and viewpoints.[13] For example, in 2018, the House Committee on Natural Resources sent letters to four prominent American environmental organizations accusing them of failing to register under FARA.[14] The letters implied that the organizations were targeted because

---

[11] Andrew Lanham, *When W.E.B. Du Bois Was 'Un-American'*, Bos. Rev. (Jan. 13, 2017), https://perma.cc/2NKQ-Z7UH.

[12] *Id.*

[13] *See id.*; Joshua R. Fattal, *The Justice Department's New, Unprecedented Use of the Foreign Agents Registration Act*, Lawfare (Dec. 18, 2019), https://perma.cc/8KL7-JQ2B.

[14] *See* Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Abigail Dillen, President, Earthjustice (Oct. 1, 2018), https://perma.cc/DN9S-PJ8U (letter to Earthjustice); Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Andrew Steer, President & CEO, World Res. Inst. (Sept. 5, 2018), https://perma.cc/8XFZ-URMP (letter to World Resources Institute); Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Kierán Suckling, Exec. Dir., Ctr. for Biological Diversity, Inc. (June 20, 2018), https://perma.cc/4HD5-8NL3 (letter to Center for Biological Diversity); Letter from Rob Bishop, Chairman, House of Representatives Comm. on Nat. Res. & Bruce Westerman, Chairman, House of Representatives Subcomm. on Oversight and Investigations of the Comm. on Nat. Res., to Rhea Suh, President, Nat. Res. Def. Council (June 5, 2018) [hereinafter NRDC Letter], https://perma.cc/FP99-3VXD (letter to Natural Resources Defense Council).

they were critical of the U.S. government.[15] To justify the investigations, the letters relied on the broadest reading of FARA's provisions.[16]

That same year, Senator Tom Cotton, joined by several other members of Congress, called on the DOJ to require the media company Al Jazeera to register under FARA.[17] The lawmakers accused Al Jazeera of having a "record of radical anti-American, anti-Semitic, and anti-Israel broadcasts" to justify the request.[18] Later, in 2020, the DOJ directed AJ+, the U.S.-based digital arm of Al Jazeera, to register under FARA.[19] The DOJ emphasized AJ+'s perceived viewpoint, characterizing it as "show[ing] support for the Palestinian cause," "question[ing] US support for Israel," and "reflect[ing] a critical position on the war in Yemen."[20]

The DOJ's recent announcement that it will shift its FARA enforcement priorities by limiting criminal prosecutions to conduct that is "similar to more traditional espionage by foreign government actors," and focusing instead on civil enforcement, only underscores the highly discretionary nature of FARA enforcement and the potential for discriminatory application.[21]

---

[15] *See, e.g.*, NRDC Letter, *supra*, at 4 (identifying the group's "adversarial approach to its advocacy practices in the United States").

[16] *See, e.g.*, *id.* at 4–5 (highlighting FARA's "request" language and noting that registration is required for any "person or group acting in the political or public interests of a foreign government or entity").

[17] Josh Gerstein, *Lawmakers Push for Al Jazeera to Register as Foreign Agent*, Politico (Mar. 5, 2018), https://perma.cc/FAS2-6ZTH.

[18] Press Release, *Sen. Cruz and Colleagues Urge Department of Justice to Investigate Qatar's Al Jazeera Network*, Sen. Ted Cruz (Mar. 6, 2018), https://perma.cc/T2T5-2G3E.

[19] Marc Tracy & Lara Jakes, *U.S. Orders Al Jazeera Affiliate to Register as Foreign Agent*, N.Y. Times (Sept. 15, 2020), https://perma.cc/5V2R-ZD9S.

[20] Dan Friedman, *The Trump Administration Orders an Al Jazeera Affiliate to Register as a Foreign Agent*, Mother Jones (Sept. 15, 2020), https://perma.cc/B94A-FQGL.

[21] *See General Policy Regarding Charging, Plea Negotiations, and Sentencing*, Office of the Att'y Gen., at 4 (Feb. 5, 2025), https://perma.cc/LBH9-N949.

FARA's history confirms the dangers of granting such broad authority to the government to go after its critics. Notably, autocratic governments like those in Russia, Kyrgyzstan, and Hungary have all recently enacted foreign agent laws in their own countries.[22] These countries claim to have modeled their laws after FARA.[23]

## II.    To avoid serious First Amendment questions, the Court should construe FARA narrowly.

As explained above, FARA's definitions of "foreign principal," "request," "political activities," and "publicity agent" can be interpreted to cover a vast array of constitutionally protected activity. Absent a narrowing interpretation, the statute risks suppressing and chilling protected speech without any legitimate governmental justification. To avoid the serious First Amendment questions that might otherwise arise, the Court should interpret FARA's terms narrowly. *See Boos v. Barry*, 485 U.S. 312, 330–31 (1988) (explaining that courts should "adopt narrowing constructions" where "fairly possible" to "avoid constitutional difficulties" raised by vague and overbroad federal laws).

The Court should, among other things, adopt a narrow reading of "request" to ensure that FARA does not impermissibly intrude on protected speech and association. Alleging that a foreign entity merely asked someone to speak favorably about the entity or its policy positions should not be sufficient, without more, to establish an agency relationship under FARA. To interpret FARA otherwise would "sweep within the statute's scope many forms of conduct that Congress did not

---

[22] *See* Iskra Kirova, *Foreign Agent Laws in the Authoritarian Playbook*, Human Rights Watch (Sept. 19, 2024), https://perma.cc/P8WR-APGD.

[23] *See, e.g.*, Pablo Gorondi, *Hungary Rejects US Criticism of Law on Foreign-Funded NGOs*, Associated Press (June 20, 2017), https://perma.cc/UH23-PKXX.

intend to regulate," *INAC*, 668 F.2d at 161, including expressive activities that reflect a potential registrant's own views and beliefs.

Moreover, FARA's mens rea requirement, which requires a "willful[ ]" violation, should be interpreted narrowly to trigger liability only for individuals who have specific knowledge of their duty to register under FARA and who intentionally violate that duty. As Dr. Terry explains in her brief, requiring specific knowledge is entirely consistent with both FARA's purposes and with precedent interpreting similar statutes. *See* Def. Br. at 22–25. FARA was enacted to help uncover potential covert foreign interference with domestic public discourse, but criminally sanctioning organizations and individuals that unintentionally and unknowingly violate the law does nothing to promote FARA's interest in disclosure. Courts often apply a heightened definition of willfulness in cases like these that involve "highly technical statutes that present the danger of ensnaring individuals engaged in apparently innocent conduct." *United States v. Starnes*, 583 F.3d 196, 211 (3d Cir. 2009); *cf. Cheek v. United States*, 498 U.S. 192, 200, 202 (1991) (interpreting "willfully" in criminal tax statutes to require "actual knowledge of the pertinent legal duty"). Because FARA similarly poses a significant danger of sweeping up innocent and unknowing conduct, the Court should adopt Dr. Terry's construction of "willfully."

Where, as here, a criminal indictment is predicated on First Amendment activity, the Court should analyze it especially closely to avoid impermissibly burdening constitutionally protected speech. *See Smith v. Goguen*, 415 U.S. 566 (1974). Although the government has a legitimate interest in better informing Americans about potential foreign manipulation of the U.S. political process, a broad reading of FARA's terms would sweep in a wide array of constitutionally protected speech and would likely violate the First Amendment. Aspects of the indictment brought against Dr. Terry illustrate some of the hallmarks of FARA's speech-suppressive vulnerabilities.

For instance, to the extent the government seeks to prosecute Dr. Terry under FARA for engaging in what appears to be advocacy of her own views, *see, e.g.*, Ind. ¶ 49, the indictment threatens to punish her for constitutionally protected speech on a matter of public concern. Plainly, merely engaging in advocacy that favors a foreign government or its policies cannot be sufficient, on its own, to establish an agency relationship or trigger liability under FARA.[24] The Court should adopt Dr. Terry's proposed interpretations of the statute to the extent they are necessary to avoid this concern and ensure that FARA is not applied in a way that violates the First Amendment.

## Conclusion

For the foregoing reasons, the Court should adopt Dr. Terry's proposed limiting constructions of FARA to the extent required to avoid the serious First Amendment questions that might otherwise arise.

March 5, 2025                                Respectfully submitted,

                                            /s/ Xiangnong Wang

Aamra Ahmad*                                Xiangnong Wang
American Civil Liberties Union Foundation   Mary "Allie" Schiele**
915 15th Street NW                          Katie Fallow
Washington, DC 20005                        Alex Abdo
Phone: (202) 457-0800                       Jameel Jaffer
aahmad@aclu.org                             Knight First Amendment Institute at Columbia
                                              University
Patrick Toomey                              475 Riverside Drive, Suite 302
Hina Shamsi                                 New York, NY 10115
Scarlet Kim                                 (646) 745-8500
American Civil Liberties Union Foundation   george.wang@knightcolumbia.org
125 Broad Street, 18th Floor
New York, NY 10004                          *Counsel for Amici Curiae*
Phone: (212) 519-7816
ptoomey@aclu.org

---

[24] *Cf. Robinson, supra*, at 1120–21 (suggesting that the government's theory was that Du Bois violated FARA because his advocacy paralleled that of a foreign organization); NRDC Letter, *supra*, at 3–4 (investigating the NRDC's status under FARA in part because the organization engaged in advocacy that was favorable to China).

*Admission *pro hac vice* pending
**SDNY admission pending

**Certificate of Service**

I, Xiangnong Wang, do hereby certify that I have filed the foregoing Brief of Amici Curiae electronically with the Clerk of the Court for the United States District Court for the Southern District of New York using the CM/ECF system on March 5, 2025. All participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

March 5, 2025                                      */s/ Xiangnong Wang*
                                                   Xiangnong Wang

                                                   *Counsel for Amici Curiae*